[L. A. No. 21048. In Bank. May 12, 1950.]

DOROTHY FINNEGAN, Respondent, v. ROYAL REALTY COMPANY (a Corporation), Appellant.

[L. A. No. 21049. In Bank. May 12, 1950.]

SOPHIE MERCHUT, Respondent, v. ROYAL REALTY COMPANY (a Corporation), Appellant.

Lasher B. Gallagher, Gibson, Dunn & Crutcher, Norman S. Sterry, Gerold C. Dunn and Frederick H. Sturdy for Appellant.

Walker, Meyers, Ingram & Moser, Parker, Stanbury & Reese and Raymond G. Stanbury for Respondents.

CARTER, J.—These appeals are taken by the defendant, Royal Realty Company, a corporation, from judgments for plaintiffs entered upon verdicts of a jury in two actions for damages for personal injuries. The complaints named as defendants the appellant and Herman Helbush, its president. The verdicts were in favor of plaintiffs against the appellant corporation, and in favor of the defendant Helbush. The actions were consolidated for trial and tried together. The

two appeals have been submitted on one set of briefs and involve identical questions.

The cases arose out of a fire which occurred on January 20, 1944, in a workroom in a building located at the corner of Wilshire Boulevard and Alvarado Street in Los Angeles. Appellant corporation was the lessor of the second floor of the building. Norman Noll, doing business as Noll & Company, was the lessee. The lease was executed on June 22, 1937, for a term which was to expire July 22, 1942, and provided that the premises were to be used for "the business of manufacturers of and dealers in club furniture and equipment, and for no other purpose" and "That the lessee will not use, or permit to be used, the said premises, or any part thereof, for any purpose or purposes other than the purpose or purposes for which the said premises are leased, demised and let unto the lessee, as hereinbefore specified." After the expiration of the lease, Noll held over as tenant from month to month under the terms of the lease and was in possession on the day of the fire. At the time of the fire, seven of Noll's employees were in the building. Of these seven, three met their death, and these two respondents were horribly burned. Respondent Merchut, who was once a pretty girl, is now a hideous caricature of her former self. Plastic surgeons have been unable to replace her eyelids, and there is the possibility that her eyesight will be permanently impaired. Respondent Finnegan's hands and arms were so badly burned that they are now useless and she is thus permanently disabled.

Noll, the lessee, was principally engaged in the manufacture of dice from celluloid. Cellulose tetranitrate is blended with camphor to produce celluloid which is a highly inflammable material. When celluloid burns, it does so rapidly and as it burns it emits the gases of nitrogen, carbon and hydrogen, and various combinations of these gases, all of which are hot and toxic in that they burn the mucuous membrane. Celluloid shavings and dust burn faster and with more violence than celluloid in the solid form and will ignite instantly upon contact with flame. Celluloid is explosive at its ignition temperature, 350 degrees Fahrenheit, without contact with flame.

The upper floor of the premises occupied by Noll was divided into two rooms, the "showroom" and the "workroom." Between these two rooms were double doors which opened *into* the workroom rather than *outward* from it. Against one of these doors on the workroom side, Noll had

placed a heavy table on which was placed a cash register thus effectively blocking one-half of this exit which on the day of the fire was the only way out of the room.

In the manufacture of dice, small particles of celluloid were drilled or shaved from the cubes and these particles had collected on the machines and on the floor. Dust and shavings were blown off the machines with electric blowers and had settled on shelves, curtains, walls, floor and the clothing, hair and persons of the workers. There was no suction equipment of any kind with which to remove the dust in the room. At the close of each day, the refuse, shavings and dust, were swept up by the employees and put into sacks which were then stacked against the wall until Noll found it convenient to take them away. At the time of the fire there were four such sacks of shavings and dust stacked against the north wall immediately east of the double doors, and a half full sack under Mrs. Finnegan's machine. Beside the sacks there was an open trash box full of shavings and dust. In addition, there were over 150 pounds of cellulose nitrate stored in the room. The doors and windows offered the only ventilation in the room. It is conceded by the parties that Noll conducted his business in a grossly negligent manner.

The fire started about 5 o'clock in the afternoon when the workers were preparing to leave for the day. Mrs. Finnegan was standing about 6 or 7 feet from the double doors leading into the showroom and had just asked Miss Merchut, who was in the southwest corner of the room, if she could help her. Mr. Reuter, another employee, was standing close to where the sacks were stacked, and made some remark to Mrs. Finnegan. As she turned toward him she saw some object, which she could not identify, fly through the air and land in the cardboard trash box. Flames immediately shot forth and hit the sacks causing an explosion. A sheet of fire then spread over the entire room. The smoke was intense.

The following points are raised on this appeal:

*(1) The Ordinance*: Appellant contends that certain sections of Ordinance No. 87000 were improperly received in evidence as they created no duty on its part to these respondents; that there is no proof that the violation of any section thereof contributed in any way to respondents' injuries; that the trial court erred in giving and refusing certain instructions with reference thereto.

*(2) Negligence*: Appellant contends that it owed no duty to these respondents under the common law.

*(3) Contributory Negligence and Assumed Risk:* Appellant contends that as a matter of law, these respondents were guilty of contributory negligence and that they assumed the risks involved in their employment.

*(4) Damages:* Appellant contends that there was no evidence from which the jury could find, without indulging in conjecture and speculation, what part of respondents' injuries are attributable solely to its acts or omissions.

*(5) Special Damages:* Appellant contends that the trial court erred in admitting proof of respondents' special damages and in instructing the jury thereon.

*(6) The Neuber case as a precedent:* (*Neuber* v. *Royal Realty Co.,* 86 Cal.App.2d 596 [195 P.2d 501]). Appellant contends that the Neuber decision (an action arising out of the same fire) was correct in holding that the various provisions of the ordinance (with the exception of the "door" section) had no application to a "building as a building" but were concerned with the use and occupancy of such buildings and placed the defendant corporation under no legal duty to prevent the violations of ordinances by either the tenant, Noll, or his employee. Appellant does not concede that the "door" section is applicable.

*(7) The Instructions.*

### THE ORDINANCE

Ordinance No. 87000 of the city of Los Angeles became effective January 1, 1943 and constituted a new building code which expressly amended the "old" building code "in its entirety" and repealed everything that was in the old ordinance and not contained in the new one.

Section 91.0101(b): *Purpose.* The purpose of this article is to safeguard life or limb, health, property and public welfare by regulating and controlling the design, construction, quality of materials, use and occupancy, location and maintenance of all buildings and structures *erected or to be erected* within the city.

Section 91.0102 provides in part that: No person shall construct, alter, repair, demolish, remove, move, *use, occupy or maintain,* within the city, any building or structure, or any portion thereof, except as provided by this code. Also that "All of the provisions of this Code shall be limitations for safeguarding life or limb, health, property and public welfare."

Section 91.0502(e): *Group E. Occupancies:* SUB-GROUP

E-1: Every room in which explosive materials in lots of more than eight pounds weight or flammable liquids are manufactured or used in any process or kept in unsealed containers; also film laboratories, film cutting rooms, and cellulose-nitrate processing rooms.

Section 91.0505(b): *Groups A and E:* Every Group A Occupancy and every Group E Occupancy shall be housed in a Type I building.

Section 91.0642: (Special Requirements for Sub-Group E-1 Occupancies):

(b) *Exits.* Every part of every building shall have two separate exits and shall be within seventy-five feet (75′) of a doorway opening into an exit.

(c) *Film and Explosive Material Storage.* Every room appropriated to the storage of explosive materials, film or cellulose nitrate in excess of 100 pounds shall conform to the requirements of division 42 of this code (Film and Explosive Vaults), unless stored in film cabinets as specified in article 7 of chapter 5 of the Los Angeles Municipal Code.

(i) *Fire-Extinguishing Apparatus.* Every room housing a Sub-group E-1 Occupancy shall be sprinklered.

Section 91.3303. (a) *Scope.* Every door serving as an exit from an aggregate floor area of more than one thousand square feet (1,000 sq. ft.) shall be constructed and installed in conformity with the requirements of this section. . . . (c) *Location.* Every door shall open on a landing at least equal in width and length to the width of the door. Doors when in any position shall not reduce the width of an exit-way to less than thirty inches (30″). (d) *Details.* Every door to an exit enclosure shall be self-closing. *Doors serving as exits shall open only in the direction of exit* and shall be openable from the inside without the use of a key. Sliding doors and rolling shutters shall not be used on exit doors. [Emphasis added.] [Note: This section applies to all buildings having the requisite amount of floor space regardless of the use made thereof.]

Section 91.0103 (entitled APPLICATION TO EXISTING BUILDINGS) provides (a) *Maintenance.* Any portion of any building or structure which, *from any cause,* has become a menace to life or limb, health, property, or public welfare shall be restored to its original condition of stability and safety, *or shall be made to conform to the regulations* of this Code, or shall be demolished. [Emphasis added.] A building or portion thereof shall be presumed to be a menace to life or limb,

health, property or public welfare if either of the following conditions exists: . . . 2. When any exit, fire-protective construction or safety device does not provide the required degree of security to life or limb, health, property or public welfare . . . (c)*Change of Occupancy.* The use or occupancy of any existing building may be changed to any use or occupancy permitted by this Code for a building of the same Type of Construction, area, location and occupancy requirements. If a portion of any building does not conform to the requirements of this Code for a proposed occupancy, that portion shall be made to conform.

Section 91.0315 (a) CERTIFICATE REQUIRED. In order to safeguard life, limb, health, property and public welfare, every building or structure shall conform to the construction requirements for the Sub-Group Occupancy to be housed therein, or for the use to which the structure is to be put . . . No building or structure or portion thereof shall be used or occupied until a Certificate of Occupancy has been issued therefor.

EXCEPTIONS: 1. No existing building or portion thereof shall require a Certificate of Occupancy unless the occupancy housed therein is different from that for which the original permit was issued. . . . (b) CHANGE OF OCCUPANCY. Each change of occupancy to one classified in a different sub-group shall require a new Certificate of Occupancy whether or not any alterations to the building are required by this code. When application is made for such Certificate of Occupancy, the Superintendent (of the Department of Building and Safety) shall cause an inspection to be made. The inspector shall advise the applicant of those alterations necessary, or if none is necessary, shall make a Report of Compliance to the Superintendent. (c) ISSUANCE OF CERTIFICATES. When required by subsection (a) of this section, and after the receipt and approval of Reports of Compliance, the Superintendent of Building *shall issue a Certificate of Occupancy, without charge, to the owner of the building.* Upon the payment of $1.00 each, duplicates of the Certificate may be secured by the owner, architect, engineer, contractor, permittee or tenant.

The sections of the ordinance which respondents claim were violated by appellant will, for convenience, be called the "door" section, the "double exit" section, the "sprinkler" section, and the "change of occupancy" section.

Appellant claims generally that these sections are not applicable because the ordinance applied only to buildings to be

erected in the future and was not intended to apply to existing buildings. It is also contended that the "door" section did not apply because the floor space in question did not total 1,000 square feet, and that, assuming it did apply, there is no showing that the fact that the door opened inward contributed to respondents' injuries. It is contended that the "sprinkler" section is applicable only when a particular use is made of the premises and that it, as owner and lessor, is not liable for the use a tenant makes of premises.

It would seem that appellant's contention that the Building Code was to apply only to buildings to be erected after its effective date cannot be sustained. By the express terms of the ordinance in question, the old building code is amended in its entirety and everything therein contained which is not contained in the new code is repealed. To sustain appellant's contention would have the effect of removing from the operation of the ordinance every building erected in the city of Los Angeles before 1943 without reference to its condition. It clearly appears from the very terms of the ordinance that this could not have been the intention of its framers who declared its purpose to be that of safeguarding life, property and public welfare by regulating and controlling the design, construction, use and occupancy of all buildings and structures *erected or to be erected* within the city. (Section 91.0101.) We find also that section 91.0103 is entitled "Application to *Existing* Buildings."

Section 91.0403(f) of the ordinance defines floor area as the area in square feet within the exterior walls of a building but not including the area of inner courts, shaft enclosures, or exterior walls. It was stipulated that the floor area of the workroom exceeds 1,000 square feet if (1) the area of the stairwell and (2) either the portion of the floor covered by the balustrade or the ledge along the inner surface of the exterior wall are included, but if the stairwell opening and either the portion occupied by the balustrade or the square footage of the ledge is excluded, the floor area was less than 1,000 square feet. By the terms of the section neither the area of the stairwell nor the portion of the floor covered by the balustrade nor the ledge along the inner surface of the exterior wall is excluded, and thus it appears obvious that the square footage of the workroom exceeds 1,000 square feet. As the floor area exceeded 1,000 square feet, the door serving as exit was required to open *outward* without reference to the use to which the premises were put.

A municipality, under the power delegated to it by the state, may enact ordinances creating duties for the protection of persons and property, and it is very generally held that those who violate such ordinances are liable for resulting injury to others. The standard of conduct of a reasonable man may be established by a statute or ordinance. The violation of such a legislative enactment may be negligence in itself if the plaintiff is one of a class of persons whom the statute was intended to protect and the harm which has occurred is of the type which it was intended to prevent. (*Harris* v. *Joffe*, 28 Cal.2d 418 [170 P.2d 454]; *Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581 [177 P.2d 279]; *Muir* v. *Cheney Bros.*, 64 Cal.App.2d 55 [148 P.2d 138]; 45 C.J. §§ 100, 105, pp. 717, 723; 1 C.J.S. § 12, p. 996; Prosser on Torts, § 39, p. 264.) Appellant's duty to these respondents to provide a proper exit from the premises is thus established by the provisions of the Building Code.

*The "door" section:*

■ Appellant's contention that there is no showing of any causal connection between respondents' injuries and the inward-opening door cannot be upheld in light of the following testimony of Mrs. Finnegan (whose face and hands and arms were burned): "Q. And was the door leading from the workroom to the showroom and the one we have been talking about here, open or closed at the time the fire occurred? A. It was closed, sir. Q. Where abouts in these premises did you get these burns to your hands? A. I got the worst part of my burns right directly at the door." . . . "He (Reuter) was hollering for me to help him from the flames on him, and thereafter the girls and all started running in a panic and hollering, and I crawled over to the door. It was all a mass of flames there, and I got—when I got to the door, I felt this pressure of these people upon top of me, and I reached up and grabbed the knob in my hand, and it slid right on down as I pulled it again; but I grabbed around and pulled up again, and reached down, and when I finally got the door open Miss Merchut had her arms around my waist. I tried to throw her arms off me when I felt the dead weight, but could not. I finally got the door open. The first time I tried to open it outward. In the excitement and panic I forgot which way the door would open, but finally I got it open and got out and pulled Miss Merchut after me. Q. All right. Let me ask you, which way did that door open. A. It opened toward me. I had to pull it inward to get out. Q. That is,

it swung inward into the workroom? A. That is correct, sir. Q. Was it a two-way door? Did it also open out? A. No, sir. Q. I assume it goes without saying you were highly excited while you were there at the door? A. Yes, sir, I was. Q. And did you recall, when you got there, which way the door did open? A. No, sir. Q. You attempted to open it first which way? A. I tried to push it from me, you know, to get out . . . There was quite a bit of panic there at the door. I felt these people shove me from every which direction and pull me down . . . I was concerned in trying to find the little knob there so I could get out myself. I knew—I was aware of Miss Merchut because she kept hollering, 'I am burning', and she had her hands around my waist, and I tried to tear them loose, and of course when I got out she still had her hands around my waist . . . Q. By Mr. Stanbury (Counsel for plaintiffs): Were you, yourself, doing anything at the door except trying to get out? A. No, sir; that is all I was trying to do. Q. And in attempting to get out, were you using your hands? A. Yes, sir. Q. What were you doing with your hands? A. Part of the time I was using this one to protect my eyes, and the other one groping around for the little small knob. Q. All right. Did you use your hand when you got hold of the knob? A. Yes, sir, I pulled it in and got out. Q. Now, was it hot around that door? A. Yes, sir, it was all in flames. Q. Were there flames around you at the time you got there? A. Yes, sir. Q. Did you get your hands burned? A. Yes, sir. I got my hands all burned, and at the time I got out, why, my hands were bleeding, they were all cut, and the flesh was falling off them. My face was swollen, and I could feel a bursting and cracking sensation to my skin. Q. Was there anything wrong with your hands before the fire? A. No, sir. Q. Have you any way of telling us how long you were at that door before you got out? A. It seemed like an eternity to me when I was there at the door . . . Q. Before the fire what substance was in that central panel of those doors? A. Wood . . . Q. And at the time this fire started, was there any obstacle or obstruction of any kind between you and this doorway? A. No, sir . . . Q. By Mr. Gallagher (Counsel for defendant): Now, it was just a matter of a second after the explosion occurred before you caught on fire, wasn't it? A. That is correct. I was right close to the door and in line with the fire, and I threw myself out. Q. In other words, you were on fire before you could

hardly move at all? A. Yes, I was right in line with the explosion. Q. Now, the smoke was so thick and dense over in the vicinity of the door as you were crawling toward it, that you could not see the door, isn't that true? . . . A. That is right. Q. By Mr. Gallagher: And in your progress while crawling along the floor, you bumped against the table on which the cash register sat? A. Yes, because it was right next to the door. Q. You could not see the table or the cash register there on account of the smoke, isn't that right? A. That is right. Q. Now, when you got to the door, you stood up, isn't that right? A. That is corerct. Q. And you could not see the door or the doorknob on account of the flames and smoke there, isn't that right? A. The flames and smoke, yes. Q. You got over to a point where you thought you were close to the door, and did you start feeling for the knob? A. Well —— Q. Or did you first try to push the door open? A. When I first got there, you see, it was just a matter of seconds from the time I threw myself to the floor until I hit the door, because I was very near it, and then I got up and tried to push my way out. Q. Then after you tried to push the door open, you remembered, or at least it came into your mind that the door opened inward, isn't that right? A. At the moment of panic, like that, I was concerned in trying to push and it would not work, so I felt around and had hold of the knob several times, but my hands slipped off from it, and the only time I really grabbed the knob I got the door open.''

Miss Merchut testified as follows: Q. (By Mr. Stanbury): What did you do when the fire broke out? A. I ran to the door. Q. When you say you ran to the door, you mean to the door to what? A. The exit door right near the elevator there . . . Q. Now, whereabouts did you get into the flames? A. When I was on my way to the door. Q. How close to the door were you? A. Oh, just a matter of a few steps, about six or seven feet away from the door. Q. And when you got to the door were you conscious of anyone else being there? A. Mrs. Finnegan was there. Q. And could you see what Mrs. Finnegan was doing? A. Trying to get out, struggling there trying to get out. Q. What did you do, if anything? A. I tried to open the door. Q. What did you do? A. I was pushing it. Q. Which way did that door open? A. It opened inward. Q. During the time you had been working there hadn't you found out which way the door opened? A. I knew it opened inward. Q. Why were you trying to open it outward? A. When I came to the door and Mrs. Finnegan

was there struggling with it, suddenly I became panicky realizing I was trapped, and I started pushing, I guess, at the door, and trying to shield my face from the flames, and Mrs. Finnegan opened the door and got out . . . Q. (By Mr. Stanbury): Now, why didn't you try to pull the door inward, yourself? . . . THE WITNESS: Well, sir, when I did get to the door, Mrs. Finnegan was struggling with it, and then, you know, I forgot, I became panicky and realized I was trapped and started pushing against it. Q. (By Mr. Stanbury): You just forgot what you were doing? A. Yes, sir. Q. You were excited? A. Yes, I was. Q. When you were there at the door, what was it like so far as whether it was in flame or not around there? A. Well, there was flame and I felt hot, and my face was burning, my arms. Q. How long were you there? A. It seemed like hours to me. Q. It seemed like hours to you? A. Yes, sir . . . MR. GALLAGHER: Miss Merchut, so far as you know, you and Mrs. Finnegan were the first two people who actually got out of that workroom, isn't that right? A. Yes, sir. Q. And did you, according to your best recollection, and I realize it might not be possible for you to remember exactly, go out first, or did Mrs. Finnegan go out first? A. That is hard to say, sir. Q. You cannot tell that? A. I know Mrs. Finnegan opened the door and I went out.''

Whether or not there was a causal connection between the violation of the ''door'' section of the ordinance and the respondents' injuries is a question of fact for the jury whose determination will not be disturbed on appeal when there is substantial evidence in support thereof. (*McEvoy* v. *American Pool Corp.*, 32 Cal.2d 295 [195 P.2d 783]; *Smith* v. *Schwartz,* 14 Cal.App.2d 160, 164 [57 P.2d 1386]; *Dougherty* v. *Ellingson,* 97 Cal.App. 87 [275 P. 456]; *Fishman* v. *Silva,* 116 Cal.App. 1 [2 P.2d 473]; *Hill* v. *Peres,* 136 Cal.App. 132 [28 P.2d 946]; 8 Cal.Jur. 10-Yr. Supp., note 4, § 139, p. 394.) From the testimony just set forth the jury could reasonably infer that Mrs. Finnegan and Miss Merchut may have been retarded in their progress from the room by reason of the fact that the doors opened inward. It cannot be said, as a matter of law, that the doors, as constructed, did not impede their exit.

It is not necessary that appellant's negligence be the sole proximate cause of respondents' injuries, but it is sufficient that it be one of the contributing causes thereof. (*McEvoy* v. *American Pool Corp., supra; Sawdey* v. *Producers' Milk Co.,* 107 Cal.App. 467, 480 [290 P. 684].) Where an injury

results from two separate and distinct acts of negligence by different persons operating simultaneously and concurrently, both are proximate causes and recovery may be had against either or both of the responsible persons. (*Sawdey* v. *Producers' Milk Co., supra*; *Hunt* v. *Los Angeles Ry. Corp.*, 110 Cal. App. 456 [294 P. 745] ; *Holahan* v. *McGrew*, 111 Cal.App. 443 [295 P. 1059] ; *Corvello* v. *Baumsteiger*, 115 Cal.App. 194 [1 P.2d 484] ; *McEvoy* v. *American Pool Corp, supra*; *Westover* v. *City of Los Angeles*, 20 Cal.2d 635 [128 P.2d 350] ; *Satterberg* v. *Pacific Gas & Elec. Co.*, 58 Cal.App.2d 296 [136 P.2d 43].)

Appellant complains that at a previous trial of another case which arose out of the same fire (*Neuber* v. *Royal Realty Co.*, 86 Cal.App.2d 596 [195 P.2d 501]), Mrs. Finnegan testified that the first time she got hold of the doorknob of the door she pulled it open and that it must, of necessity, follow from this that the manner in which the door opened did not contribute to respondents' injuries. It seems apparent that no such result is necessary. Furthermore, if the previous testimony created a conflict in the evidence, the resolution of that conflict was for the trier of the fact whose determination will not be disturbed on appeal where substantial evidence exists to support it. (*Weintraub* v. *Soronow*, 115 Cal.App. 145 [1 P.2d 28] ; *Farmers Bank of Camarillo* v. *Goodrich*, 90 Cal.App. 717 [266 P. 550] ; *Dowd* v. *Joyce*, 85 Cal.App. 377 [259 P. 368] ; *Morton* v. *Manhattan Lunch Co.*, 41 Cal.App.2d 70 [106 P.2d 212] ; *Rivera* v. *Goodenough*, 71 Cal.App.2d 223 [162 P.2d 498] ; *Alward* v. *Paolo*, 79 Cal.App.2d 1 [179 P. 2d 5].)

*The "double exit" section:*

At the time the lease to the tenant was made there was a second exit in the room. This exit led to a flight of steps which went down into the storeroom and from there down another flight of steps to a door in the basement which opened onto an alley. At some time during the period of the lease, Noll, the tenant, had placed heavy planking over the stairwell leading from the storeroom into the basement, and he had nailed a heavy prop against the door leading into the alley—thus effectively blocking the second exit from the room.

Section 91.3301(a) provides that "The purpose of the limitations of this Division is to provide safe and continuous means of egress from every portion of every building." The evidence shows that the door had been nailed shut for nearly

four years and that the stairwell had been planked over for longer than that. The only time that the planking and door prop were not present was when supplies were brought through the alley door. Appellant contends that these obstructions were not structural changes but merely temporary ones created by Noll for which it is not liable.

With respect to these obstructions, the court gave an instruction based on section 660 of the Civil Code which reads, in pertinent part, as follows: "I instruct you that a letting, if any, of the premises by an owner thereof with knowledge that the same do not conform structurally to the foregoing requirements, if they did not so conform, would constitute a violation of the said 'Ordinance'." and "The second (question) is regarding exits—'If blocking of exits is temporary then it is not a structural change. Please define "temporary" and "structural." Would "to fix by nailing" be permanent? Or, "to prevent the use of under ordinary circumstances" be permanent?'" (The Court): "We can suggest that Section 660 of the Civil Code provides that anything that is nailed to a building is deemed to be a permanent attachment thereto, or words to that effect. *The question of what is temporary and structural is something for you to say, with regard to the facts in this case.*" And Instruction No. 11: "You are instructed that in order to be held liable for the proximate results of unlawful structural features, if any, of a building, it is not necessary that the owner should itself have created the condition which caused the violation of law. The obligation of the owner with respect to the leasing of buildings which are structurally defective in violation of ordinances may arise when to its knowledge the tenant has changed the structure of said building, or is putting the same to uses for which the same are in violation of ordinances . . ."

The following instruction (No. 38) was given by the court at appellant's request: "If, from the evidence, you believe that at the time of the execution of the lease and at all times thereafter the workroom was equipped with the requisite number of exits required by the ordinances of the city of Los Angeles, but that one or more of such exits were blocked and rendered incapable of easy or ready use, and that such blocking of the exits was done by Norman Noll or his employees, and that the blocking or obstruction of any exit was of a temporary character and one which did not affect the building in any structural way, then the court charges you the defendants would not, nor would either of them, be responsible therefor, and

the blocking of such exit would not constitute a basis for a verdict in favor of either plaintiff against the defendants, or either of them.'' The jury was also instructed (No. 46) that ''. . . the defendants did not owe any duty to the plaintiffs, or either of them, to inspect the premises leased to Noll to ascertain if they were being either legally or carefully used by the said Noll or any of his employees and, therefore, before the defendants can be charged with knowledge of any unlawful act of Noll, they must have had knowledge and notice thereof.'' This instruction was given as requested by appellant with the omission of the word ''actual'' before the word ''knowledge.'' The court then gave an instruction defining actual and/or constructive notice or knowledge.

The jury impliedly found that the tenant had made structural changes in the building which violated the ordinance when he blocked the other exit from the room, and that this change was known to the defendant and raised a duty on its part to terminate the tenancy or force the tenant to remove the obstructions to comply with the mandate of the safety measure enacted by the city. (*Roxas* v. *Gogna*, 41 Cal.App.2d 234 [106 P.2d 227] ; *Harmon* v. *M. H. Sherman Co.*, 29 Cal. App.2d 580 [85 P.2d 205] ; *Goetz* v. *Duffy*, 215 N.Y. 53 [109 N.E. 113] ; *Tvetd* v. *Wheeler*, 70 Minn. 161 [72 N.W. 1062] ; *Tralle* v. *Hartman Furniture & Carpet Co.*, 116 Neb. 418 [217 N.W. 952] ; *Moore* v. *Dresden Inv. Co.*, 162 Wash. 289 [298 P. 465, 77 A.L.R. 1258].) Taking into consideration the physical aspects of the means used to block the one exit it cannot be said as a matter of law that the change was not a structural or permanent one.

The record shows that respondent Merchut was standing close to the blocked exit when the fire started, and that she was burned while running toward the only available door. The record also shows that the part of the room in which she had been standing when the fire started did not burn. No citation of authority is necessary nor is any argument needed to show that an exit which is impassible is no exit at all.

*The ''sprinkler'' section:*

Appellant contends that the section of the ordinance which required every room housing this type of an occupancy to be sprinklered applies only when a particular use is made of the premises and that it was solely the tenant's duty to comply with this section. Respondents, on the other hand, contend that appellant, knowing the use to which the premises were being put and that the building did not comply with

the safety regulations prescribed by the ordinance, is liable to them for the violation thereof.

An ordinance which requires certain buildings to be equipped with automatic fire sprinklers is a proper exercise of the police power of the state or municipality to provide regulations for the protection of life and property. (*City of Chicago* v. *Washingtonian Home of Chicago,* 289 Ill. 206 [124 N. E. 416, 6 A.L.R. 1584] ; *Commonwealth* v. *Badger,* 243 Mass. 137 [137 N.E. 261] ; 6 A.L.R. 1591, and cases there cited.) The situation here is analogous to the one presented in the case of *Roxas* v. *Gogna,* 41 Cal.App.2d 234 [106 P.2d 227], where an ordinance provided that if a certain building were *used* as a lodging house it must be equipped with a fire escape. The building was leased to one who, by his use of the premises, brought it within the provisions of the ordinance. It was there held that the plaintiff, one of the lodgers, was entitled to recover against the owners of the building for injuries sustained by him when he was forced to jump from a second story window during a fire. The court said that while the ordinance did not name the person upon whom the duty to provide the fire escape rested, where the owner leased the premises knowing for what purpose it was to be used, the duty to comply with the ordinance should be upon him. In such a case, the obligation of the owner as to third persons is not under the contract with the lessee, but rather under the law, violation of which constitutes negligence. (*Hurtel* v. *Albert Cohn, Inc.* 5 Cal.2d 145 [52 P.2d 922] ; *Wright* v. *Los Angeles Ry. Corp.,* 14 Cal.2d 168 [93 P.2d 135] ; 19 Cal.Jur., Negligence, § 65, p. 632; Harper, Law of Torts, p. 187, S. 78; 14 So.Cal. L.Rev. 194; *Moore* v. *Dresden Inv. Co.,* 162 Wash. 289 [298 P. 465, 469, 77 A.L.R. 1258].) Statutes and ordinances prescribing the safety features of buildings impose a duty of compliance upon the property owner. Where such a statute or ordinance fails to designate the person charged with the duty of compliance, the initial responsibility is that of the owner. (*Roxas* v. *Gogna,* 41 Cal.App.2d 234 [106 P.2d 227] ; *Harmon* v. *M. H. Sherman Co.,* 29 Cal.App.2d 580 [85 P.2d 205] ; *Goetz* v. *Duffy,* 215 N.Y. 53 [109 N.E. 113] ; *Tralle* v. *Hartman Furniture & Carpet Co.,* 116 Neb. 418 [217 N.W. 952, 955] ; *Burt* v. *Nichols,* 264 Mo. 1 [173 S.W. 681, 684, L.R.A. 1917E 250] ; *Moore* v. *Dresden Inv. Co.,* 162 Wash. 289, 298 P. 465, 468-473, 77 A.L.R. 1258].)

There is evidence in the record to show that the president of appellant corporation was in the workroom and saw

the celluloid from which the dice were being manufactured, and that the manufacturing operations were explained to him by Noll's staff. Actual knowledge of a property owner, where necessary as a basis of liability, may be inferred from his knowledge of other facts placing him on inquiry. (*Turner* v. *Lischner,* 52 Cal.App.2d 273, 277 [126 P.2d 156].) The record shows that appellant corporation's president called at the establishment approximately every six weeks during the tenancy.

It is contended by appellant that, assuming it was under a duty to comply with the section requiring an automatic sprinkler system, respondents have shown no causal connection between the violation of that duty and their injuries. The question of proximate cause is one for the jury, and before an appellate court will reverse a judgment upon the ground of insufficiency of the evidence to support a finding of causal connection it must appear from the record that, accepting the full force of the evidence adduced, together with every inference favorable to the prevailing party which may be drawn therefrom, and excluding all evidence in conflict therewith, it still appears that the law precludes such prevailing party from recovering a judgment. The evidence must be construed most strongly against the losing party. Every favorable inference and presumption which may fairly be deduced from the evidence should be resolved in favor of the prevailing party. (*Lindsey* v. *DeVaux,* 50 Cal.App.2d 445, 448 [123 P.2d 144], hearing denied.) Just what would have happened in the present case had a sprinkler system been in operation is not capable of direct proof and must, of necessity, be largely a matter of speculation or of inference. And, even so, it has been held that the question is one for the jury, and not for the court. (*Revegno* v. *San Jose K. of C. Hall Assn.,* 108 Cal.App. 591-595 [291 P. 848], hearing denied; *Lindsey* v. *DeVaux, supra*; 19 Cal.Jur. 732; 38 Am.Jur. 1056; *Stockwell* v. *Board of Trustees,* 64 Cal.App.2d 197, 204, 205 [148 P.2d 405], hearing denied; *Dennis* v. *Gonzales,* 91 Cal.App.2d 203 [205 P.2d 55].) Respondents' expert witness testified that the automatic sprinklers would have gone into operation when the temperature at the ceiling reached 165 degrees Fahrenheit, which would have been within two or three seconds after the outbreak of the fire.

*"Change of Occupancy" section:*

The original permit issued to appellant corporation was one allowing it to house "stores and offices" in the build-

ing. Appellant maintains that this section does not apply to it, that the duty, if there was one so far as an existing building is concerned, to obtain a Certificate of Change of Occupancy rested upon the tenant, Noll. It contends that it was not the leasing by it which might be said to be unlawful, but the occupancy of the premises. It is further contended that, even if the duty were upon it to secure such a certificate, plaintiffs have shown no causal connection between the failure to procure the certificate and their injuries. Respondents, on the other hand, maintain that these sections of the ordinance were admitted in evidence *only* to show that appellant knew that it had leased premises for an occupancy which was unlawful under the original permit and that the required application would, by the terms of the section, have necessitated an inspection and a report of any necessary alterations and that appellant should be charged with knowledge of what the inspection would have revealed. It clearly appears from the record that appellant had knowledge that the lessee was engaged in manufacturing dice. The lease itself provided that the premises were to be used for the business of *"manufacturers* of and dealers in club furniture and equipment . . ." It would seem that since the original permit had been applied for and issued to the owner of the building the responsibility of procuring a Change of Occupancy Certificate was upon it. After the expiration of the original lease, there was a month to month tenancy in effect and the appellant-lessor had the right of reentry. At the expiration of the lease the section requiring a change of occupancy certificate was in effect and appellant corporation must be charged with knowledge of that requirement. From the following testimony of appellant's president, Mr. Helbush, it would appear that the company considered that it was its duty to apply for the necessary permits, of whatever character, from the city. Mr. Helbush's statement that at the time of making the lease he did not know the extent of the tenant's manufacturing operations would not excuse him subsequently. Prior to the time of the fire, he knew that Noll was manufacturing dice, and he must be charged with knowledge of the sections of the ordinance providing for safety devices necessary in a building where such a business was being carried on. (*Cragg* v. *Los Angeles Trust Co.*, 154 Cal. 663 [98 P. 1063, 16 Ann.Cas. 1061] ; *Andreen* v. *Escondido Citrus Union,* 93 Cal.App. 182 [269 P. 556].) The testimony of Mr. Helbush (president) : Q. Those (Exhibits 55, 56, 34, 35) are the applications of the Royal Realty Com-

pany to make alterations requested by Mr. Noll, are they not? A. Yes.   Q. And I notice that they recite that the purpose of the building after the alteration or moving is stores and offices? A. That is correct.   Q. Now, the lease that you signed at the same time with Noll gives as its purpose what we have already read here, and I won't read it again.   You stated that you did not understand that was his actual purpose, so I am going to ask you, sir, to look at your testimony of January, 1946, page 61, line 24, to page 62, line 9, where I have marked it in red (handing to witness) . . . A. Yes, I testified to that the same as I have testified now, too.   Q. Now, when you signed this lease—you did sign this lease yourself, did you not?   A. I did. Q. Well, at that time you read it, did you not?   A. It was my understanding it was just like I say now, my understanding was all the place was going to be used for was the manufacturers or dealers in club furniture, manufacture as dealers. Q. When you filed this document with the city, you said the use was stores and offices.   When you signed the lease, you said manufacturers or dealers in this equipment. . . . Q. Then this is the situation, is it not: that when you signed the lease with Noll, it provided what I have already read as to manufacturing, but when you made your application for repairs in connection with the same lease to the city, you recited only that the purposes are offices, is that correct?   A. That is all I thought it was at any time.   Q. All right, but in the document you filed with the city, you stated offices, and in the leases you said what I have already read.   That is a fair statement, is it not?   A. I know, but that is not the way the understanding was.   Q. Mr. Helbush, that is a question of fact.   A. O.K. Q. So I am confining myself to what is written, and not what you or I think . . . Q. Please answer the question, if I have accurately read what you had written down when you were dealing with Noll.   *Mr. Gallagher*: That is objected to as asked and answered.   The document speaks for itself.   *Mr. Stanbury*: It has been asked, but not answered.   *The Court:* The question has been asked, but he has not answered it.   *The Witness*: Yes, it is written down like this in the lease.   *Mr. Stanbury*: And I have also accurately read what is written down in the representation to the Safety Board of the City, have I not?   A. Yes, you did.   (Objected to, and question reframed.)   *Mr. Stanbury*: I have also correctly read what was written down by your company when it informed the Department of Building and Safety of this City what the purpose of the alterations for Noll was, have I not?   (Mr. Helbush then admitted that these

applications to the city were signed by Mr. Livingston, secretary of the Royal Realty Company, and the architect of the company, a Mr. W. L. Schmolle.)

Respondents did not endeavor to show any causal connection between the failure to obtain the certificate and their injuries, and it would seem that there is none. If appellant corporation had the duty to obtain the certificate, as contended by respondents, and failed to do so, the requirement together with the original applications to the city at the time the lease was entered into would be sufficient to show that appellant knew it had leased premises for a purpose not in the contemplation of the city authorities at the time the original permit was granted. Appellant's subsequent knowledge of the extent of the manufacturing operations being carried on by Noll would seem to raise a duty on its part to terminate the tenancy at the expiration of the lease in July, 1942, or at any period thereafter during the time the tenancy was continued on a month to month basis and *particularly* because from 1943 until the date of the fire appellant would be charged with knowledge of the various sections of the ordinance which had been enacted for the avowed purpose of safeguarding life, limb and property, and with the knowledge that the building leased by it was not structurally safe for the purpose for which it was being used.

The jury was instructed (No. 28) as follows: "You are hereby instructed that on July 15, 1942, when the original five year period of the lease expired, the defendant, Royal Realty Company, was not required by the terms of the lease to permit the tenancy of Noll and Company to continue. Thereafter, up to and including the time of the fire here involved, the said defendant was entitled, on one month's notice, to terminate said tenancy. I instruct you that if the owner of premises knowingly permits the same to be continually used for purposes for which they are structually in violation of the building ordinances read to you in these instructions, while having the power to terminate such use and occupancy by giving notice of termination or by refusing to permit the extension thereof, he violates such ordinances. You are to determine the facts." And (No. 30): "You are instructed that the knowledge of an agent is imputed to his principal. Therefore, if you should find that any of the officers of the Royal Realty Company had knowledge of a fact, you must also find that the defendant, Royal Realty Company, was possessed of the same knowledge."

## COMMON LAW LIABILITY

Subject to certain exceptions, a lessor is not subject to common law liability for harm caused to the lessee, or to others upon the land or outside of it, by the condition of the premises or the activities of the lessee. (Prosser on Torts, § 81, p. 648; Harper on Torts, § 103, p. 234.) Respondents do not claim that appellant owed them any common law duty of care.

## CONTRIBUTORY NEGLIGENCE

It is claimed by appellant corporation that plaintiffs were guilty of contributory negligence as a matter of law in that they violated certain sections of the Los Angeles Municipal Code, and section 13001 of the Health and Safety Code. The just mentioned section of the Health and Safety Code prohibits any person from throwing or placing any substance or thing which may cause a fire in any place where it may directly or indirectly cause a fire. The Los Angeles Municipal Code, section 57.21, prohibits any person from storing, manufacturing, polishing, finishing, perforating or handling any cellulose nitrate products except as provided therein. One of the requirements is that all such products when not in actual use or being worked upon shall be kept in approved manila envelopes or other approved containers. Section 57.24 prohibits any person from failing to entirely remove or safely dispose of combustible waste material or litter at the close of each working day. Such combustible material is to be stored in approved incombustible receptacles or in rooms or vaults approved by the building department. Section 57.27 prohibits any person from permitting the accumulation of any explosive or inflammable dust in quantities sufficient to create a fire or explosion hazard on electric motors, walls, ledges, or other interior surfaces on which dust may settle. Section 57.04 prohibits any person from storing, manufacturing, polishing, finishing, perforating, transporting, or handling of any cellulose nitrate products without a permit. Section 11.01 provides that "person" shall mean a natural person, a business organization of any type or the manager, lessee, agent, servant, or officer or employee of any of them.

A complete answer to appellant's contention that respondents were among the "persons" contemplated by these provisions is that section 11.01(a) provides that "The following words and phrases whenever used in this Code shall be construed as defined in this Section *unless from the context a different meaning is intended,* or unless a different meaning

is specifically defined and more particularly directed to the use of such words or phrases.'' [Emphasis added.] Section 57.04(a) provides that ''No person shall, *without a written permit* then in effect from the Board (of Fire Commissioners) so to do, (1) Manufacture . . . (8) Store, manufacture, print, develop, wash, dry, polish, finish, assemble, perforate, fix, repair, transport or handle any cellulose nitrate products . . .'' [Emphasis added.] Thus, it clearly appears from the context that the framers of the section intended that someone with authority and control should obtain the permit—not persons in the position of plaintiffs who were paid a wage of $30 per week and whose duties were more or less mechanical in that they involved only one small part in the manufacture or making of the dice, and whose duties involved no discretion and no power to change the method of doing the work.

Section 57.24 provides (a) that ''No person making, using, storing *or having charge or control of any* . . . other combustible waste material or litter, or having charge or control of any building, structure or premises where the same may be located, shall fail, neglect or refuse to entirely remove or safely dispose of same at the close of each working day . . .'' [Emphasis added.] Section 57.27 provides for the *installation* of specified types of machinery and equipment to prevent the accumulation of any explosive or inflammable dust in quantities sufficient to create a fire or explosion hazard. Again, it appears from the context that all of these sections were intended to apply to someone having the control of the business and the authority to comply with the provisions.

With respect to section 13001 of the Health and Safety Code there is no evidence in the record to show that there was any causal connection between these respondents and the origin of the fire.

*Common Law Contributory Negligence:*

It is contended by appellant that respondents were guilty of contributory negligence in that they were engaged in the manufacture of dice from cellulose nitrate. Whether or not respondents were guilty of contributory negligence was a question of fact for the jury. (*Scholey* v. *Steele,* 59 Cal. App.2d 402 [138 P.2d 733]; *Anthony* v. *Hobbie,* 25 Cal.2d 814 [155 P.2d 826]; *Stockwell* v. *Board of Trustees,* 64 Cal. App.2d 197 [148 P.2d 405].) Where contributory negligence is set up as a defense, it seldom happens that the question is so clear from doubt that the court can undertake to say as a matter of law how the jury should find upon the issue. (*Mc-*

*Wane* v. *Hetherton,* 51 Cal.App.2d 508 [125 P.2d 85] ; *Zehnder* v. *Spaulding,* 53 Cal.App.2d 268 [127 P.2d 620] ; *Pewitt* v. *Riley,* 27 Cal.2d 310 [163 P.2d 873].)

The jury was repeatedly instructed that respondents could not recover if they were guilty of contributory negligence which was comprehensively defined in the instructions. The jury impliedly found that respondents were not guilty of contributory negligence and it cannot now be said as a matter of law that they did not exercise ordinary care for their own safety.

*Imputed Negligence:*

Appellant contends that respondents may not recover since their employer's negligence is imputed to them. In *Scholey* v. *Steele,* 59 Cal.App.2d 402, 405, 406 [138 P.2d 733] (wherein the court affirmed a judgment for an invitee of a negligent tenant), it was said: ''It is further argued, because of the language used in some of our decisions that an invitee to the premises 'stands in the shoes of the tenant, and therefore may not recover if the tenant cannot' (*Runyon* v. *City of Los Angeles,* 40 Cal.App. 383 [180 P. 837] ), that plaintiff is barred from recovery by Mrs. Enos' negligence.

''It may be doubted whether the statement that the invitee stands in the shoes of the tenant is intended to be so sweeping as to impute the tenant's negligence to his invitee. Rather it would seem to be a *catch phrase* to indicate that the duty owed to the invitee by the landlord is identical with the duty owed by him to the tenant.''

In *Singer* v. *Eastern Columbia, Inc.,* 72 Cal.App.2d 402, 412 [164 P.2d 531] (hearing denied), it was said: ''We are aware of neither authority nor sound reason for applying the doctrine of imputed negligence to a case of injury to the tenant's invitee which has resulted from the landlord's breach of duty to make repairs. The rule applicable in such a case is that if the landlord has agreed to repair a specific condition which is known to be dangerous, he is liable if the duty to repair rested upon him and he had knowledge of the condition. In either case the invitee of the tenant is chargeable with knowledge only of what he actually knows or, in the exercise of ordinary care, should know of the dangerous condition.''

## ASSUMED RISK

Where an ordinance is a police regulation, made for the protection of human life, it is an obligation imposed upon the defendant by a salutary police regulation and the doctrine

of assumption of the risk does not apply. Public policy forbids that the duty which the defendant owes to the plaintiffs should be waived by plaintiffs' mere passive quiescence, even though with knowledge of the infraction of the ordinance. (*Martello* v. *Beletich,* 59 Cal.App. 533 [211 P. 20]—Judge Finlayson's concurring opinion.) In *Friedman* v. *Pacific Outdoor Adv. Co.,* 74 Cal.App.2d 946, 952-953 [170 P.2d 67], it was said that the doctrine of *volenti non fit injuria* is not applicable where the injury arises from a violation of an ordinance. Neither does it apply to the maintenance of a nuisance unless the aggrieved party contributed to such maintenance. Even though a person may waive the benefit of a law enacted for his own benefit an ordinance enacted for the public good cannot be contravened by private agreement. Public policy requires that duties imposed by statute be discharged and that those who are affected cannot suspend the operation of the law either by waiver or by express contract. (*Adams* v. *Cumberland Inv. Co.,* 117 Tenn. 470 [101 S.W. 428]; *Martello* v. *Beletich, supra*; *Rauch* v. *Southern California Gas Co.,* 96 Cal.App. 250 [273 P. 1111]; *Moore* v. *Dresden Inv. Co.,* 162 Wash. 289 [298 P. 465, 77 A.L.R. 1258]; *Landgraf* v. *Kuh,* 188 Ill. 484 [59 N.E. 501]; *Goetz* v. *Duffy,* 215 N.Y. 53 [109 N.E. 113].)

There are certain statutes which clearly are intended to protect the plaintiff against his inability to protect himself. Such are the child labor acts, and various safety statutes for the benefit of employees as to which the courts have recognized, in this respect at least, the economic inequality in bargaining power which has induced the passage of the legislation. Since the fundamental purpose of such statutes would be defeated if the plaintiff were permitted to assume the risk, it is generally held that he cannot do so, either expressly or by implication. The workman has no alternative but the loss of his livelihood, it is his "poverty and not his will" which consents, and economically he is no more free to leave his employment than a soldier or a sailor. (Prosser, § 51, p. 392; *Suess* v. *Arrowhead Steel Products Co.,* 180 Minn. 21 [230 N.W. 125]; *Osborne* v. *Salvation Army,* 107 F.2d 929; *Welch* v. *Waterbury Co.,* 206 N.Y. 522 [100 N.E. 426]; *Depre* v. *Pacific Coast Forge Co.,* 151 Wash. 430 [276 P. 89].)

### PROVISIONS OF THE LEASE

Appellant complains, in general, with regard to the pertinent sections of the ordinance that the lease provided as fol-

lows: "SEVENTH: That the lessee will, at the sole cost and expense of lessee, comply with all the requirements pertaining to the said premises, and to the business to be carried on by the lessee in the said premises, of all Municipal, State, County and Federal authorities."

Statutes frequently require fire escapes to be maintained on certain buildings, elevators and their shafts to be guarded, and other floor openings to be made safe. In connection with these statutes there is a preliminary question as to whether the duty of making the required improvements rests upon the landlord or upon the tenant. The better view is that the duty of making these improvements rests upon the landlord because they are of a permanent nature and substantially benefit his reversionary interest. The courts that adhere to this view hold that the landlord is liable for damages to anyone rightfully upon or about the premises caused by the landlord's failure to make the improvements required by these statutes. (Harkrider, *Tort Liability of a Landlord,* 26 Mich.L.Rev. 383, 391; *Cowen* v. *Story & C. Piano Co.,* 170 Ill.App. 92; *Steiert* v. *Coulter,* 54 Ind.App. 643 [102 N.E. 113, 103 N.E. 117]; *Fowler Packing Co.* v. *Enzenperger,* 77 Kan. 406 [94 P. 995, 15 L.R.A.N.S. 784]; *Barfoot* v. *White Star Line,* 170 Mich. 349 [136 N.W. 437]; *Pauley* v. *Steam-Gauge & Lantern Co.,* 131 N.Y. 90 [29 N.E. 999, 15 L.R.A. 194].)

The authorities hold that the landlord's duty to make safe those portions of premises which he furnishes for common use, on premises leased to various tenants, is one that cannot be delegated. In line with the principle stated, where a hotel owner was required by municipal ordinance to provide adequate fire escape equipment on premises leased for that use, the owner was not relieved of his obligation thereto by the fact that he had leased the premises and that the tenant had assumed as between them the obligation to provide the equipment. In such case the duty imposed on the landlord is mandatory and cannot be delegated to the tenant, nor to any other entity or person. (Bennett, Landlord & Tenant, § 349, p. 496; *Moore* v. *Dresden Invest. Co.,* 162 Wash. 289 [298 P. 465, 77 A.L.R. 1258]; *Tralle* v. *Hartman Furniture & Carpet Co.,* 116 Neb. 418 [217 N.W. 952].) It would seem that this principle is sound in reason. If a landlord may delegate his duty of compliance with safety ordinances and statutes designed for the protection of members of the public rightfully on the premises to persons who may be financially irrespon-

sible, all salutary legislation would soon become a nullity. The situation is somewhat analogous to that of one who employs an independent contractor. Where the law imposes a definite, affirmative duty upon one by reason of his relationship with others, whether as an owner or proprietor of land or chattels or in some other capacity, such person cannot escape liability for a failure to perform the duty thus imposed by entrusting it to an independent contractor. (Restatement of the Law of Torts, 286.) And it is immaterial whether the duty thus regarded as "nondelegable" be imposed by statute, charter or by common law. (79 U.of Pa.L. Rev. 90, citing cases; *Wilson* v. *Thayer County Agricultural Soc.*, 115 Neb. 579 [213 N.W. 966, 52 A.L.R. 1393]; 37 Yale Law Journal 113.)

## DAMAGES

Appellant contends that there was no evidence from which the jury could find, without indulging in conjecture and speculation, what portion of the respondents' injuries was attributable solely to the acts or omissions of appellant.

In *City of Oakland* v. *Pacific Gas & E. Co.*, 47 Cal.App.2d 444 [118 P.2d 328], the court said (p. 450): "One who contributes to damage cannot escape liability because the proportionate contribution may not be accurately measured. [Cases cited.] It is incumbent upon the party alleging injury to prove the amount of damages. Respondents sustained that burden in this case. If the damages proven could be reduced proportionately, that burden rested upon appellant. [Cases cited.] The record does not show that appellant sustained that burden." In *Cummings* v. *Kendall*, 41 Cal.App.2d 549 [107 P.2d 282], the court imposed the burden of differential proof upon the defendant. In *Slater* v. *Pacific American Oil Co.*, 212 Cal. 648, 654 [300 P. 31], it was held that as far as ascertainable from the record, there was evidence that appellant contributed substantially to the damage, or at least to the aggravation thereof, and that the amount of compensation awarded was "an approximation to accuracy."

Where several persons act in concert and damages result from their joint tort, each person is held for the entire damages unless segregation as to causation can be established. Even though persons are not acting in concert, if the result produced by their acts are indivisible, each person is held liable for the whole. Death, burning of a building or the sinking of a boat are such indivisible results. The reason for imposing

liability on each for the entire consequence is that there exists no basis for dividing damages and the law is loath to permit an innocent plaintiff to suffer as against a wrongdoing defendant. This liability is imposed where each cause is sufficient in itself as well as where each cause is required to produce the result. (15 So.Cal.L.Rev. 439.)

In *Summers* v. *Tice*, 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], this court said: "In addition to that, however, it should be pointed out that the same reason of policy and justice shift the burden to each of defendants to absolve himself if he can —relieving the wronged person of the duty of apportioning the injury to a particular defendant, apply here where we are concerned with whether plaintiff is required to supply evidence for the apportionment of damages. If defendants are independent tort feasors and thus each liable for the damage caused by him alone, and, at least, where the matter of apportionment is incapable of proof, the innocent wronged party should not be deprived of his right to redress. The wrongdoers should be left to work out between themselves an apportionment. (See, *Colonial Ins. Co.*, v. *Industrial Acc. Com.*, 29 Cal.2d 79 [172 P.2d 884].) Some of the cited cases refer to the difficulty of apportioning the burden of damages between the independent tort feasors, and say that where factually a correct division cannot be made, the trier of fact may make it the best it can, which would be more or less a guess, stressing the factor that the wrongdoers are not in a position to complain of uncertainty. (*California O. Co.* v. *Riverside P. C. Co., supra,* 50 Cal.App. 522 [195 P. 694])."

The jury was clearly instructed (Nos. 64, 42) that the appellant was not liable for the starting of the fire, and from the above cited authorities it clearly appears that appellant's contention is without merit.

### SPECIAL DAMAGES

It is appellant's contention that where an employer or his insurance carrier pays to an employee the compensation required under the Workmen's Compensation statutes, the carrier or employer then has an independent right to recover for such items from a third party whose negligence injured the employee. It is argued that Noll's insurance carrier stands in Noll's shoes and that Noll's gross negligence is imputed to it as the recipient of any special damages and that the judgment should be reduced accordingly. Precisely the same contention was made in the case of *Pacific I. Co.* v. *Cali-*

*fornia etc. Wks., Ltd.*, 29 Cal.App.2d 260 [84 P.2d 313], and answered adversely to appellant. It was there held that when an employee brings an action against a negligent third party for damages for personal injuries, the contributory negligence of his employer does not bar the employer or its insurance carrier from asserting a lien on the employee's judgment for the amount of workmen's compensation and medical expenses paid to or on behalf of the employee as a result of the injuries. Although this decision was based on section 26 of the Workmen's Compensation Act as it read in 1931, sections 3854 and 3855 of the Labor Code contain substantially the same language.

Section 3856 (Lab. Code) reads as follows: "The court shall first apply, out of the entire amount of any judgment for any damage recovered by the employee, a sufficient amount to reimburse the employer for the amount of his expenditures for compensation. *If the employer has not joined in the action or has not brought action, or if his action has not been consolidated,* the court, on his application shall allow, as a first lien against the entire amount of any judgment for any damages recovered by the employee, the amount of the employer's expenditures for compensation." [Emphasis added.]

The italicized portion of the section would appear to answer appellant's contention that the employer's right is a separate and independent one and not a right derived by virtue of subrogation to such rights as his employees may have against a third party. He, or his insurance carrier (Section 3850(b)), is entitled to a lien *if he has not joined in the action, or has not brought action, or if his action has not been consolidated.* The section provides that the court shall allow, *on his application,* a first lien against the entire amount for any expenditures made for compensation. The chapter wherein the foregoing sections are found is entitled "Subrogation of Employer," and no mention is made in any part thereof that the contributory negligence of the employer shall defeat his right to such a lien.

The trial court did not err in admitting proof of special damages and in instructing the jury thereon.

### THE NEUBER CASE

A sufficient answer to appellant's contention in this respect is that the two cases were not similarly presented, nor were the plaintiffs in the two cases, other than being victims of the

same tragedy, similarly situated factually. In *Morris* v. *Fortier*, 59 Cal.App.2d 132, 136-138 [138 P.2d 368], it was held that the same results need not follow, even on the same evidence, when two appeals from decisions of trial courts reaching opposite conclusions are not before an upper court at the same time. In *Southern Pacific Co.* v. *City of Los Angeles*, 5 Cal.2d 545, 548 [55 P.2d 847], this court stated that in order that victims of the same misfortune share the same fate, their cases must be before an appellate court at the same time, that the facts be the same, and also that the cases be similarly presented. That the two cases were not tried and presented under the same theories is admitted by appellant (in its Op. Brief, page 37.): "That case was tried and presented under theories somewhat different from those in the present case, and the evidence there somewhat differed from the evidence of the present cases." The Neuber case was apparently tried in the main on the theory that the Royal Realty Company owed a common law duty of care to the employees of Noll, the tenant.

## The Instructions

Appellant contends that the trial court committed prejudicial error in instructing the jury:

(1) With respect to any of the ordinances offered by the plaintiffs;

(2) With respect to the "building as a building";

(3) With respect to the "use and occupancy" of the building;

(4) With respect to damages, general and special; and

(5) With respect to the zoning ordinance.

Because of the views expressed herein, appellant's contention that the trial court committed prejudicial error in giving instructions on the first four subdivisions as set forth above cannot be sustained.

It is contended that the trial court erroneously admitted in evidence section C-3 of section 12.01 of Ordinance No. 87000 and instructed the jury thereon. The section, in substance, provides that not more than 10 per cent of the rentable floor area in a C-3 Zone may be used for light manufacturing, provided that where all articles are sold at retail then up to 15 per cent of the floor space may be so used. It is conceded that Noll used more than 15 per cent of the floor space rented to him, and that the provisions of

the section were violated. It is contended, however, that this section applied only to the use made of the building, and not to the "building as a building"; and that the zoning ordinance was intended for the protection of the values of properties within the zone and not to afford a right of action to a person not within the class designed to be protected. In this respect, appellant's contention is meritorious. The court instructed the jury that the violation of the zoning ordinance *"did not afford a basis for recovering by either plaintiff against the defendants, or either of them, and it is not claimed by plaintiffs that they are entitled to recover on those grounds."* Assuming that the section of the ordinance pertaining to zoning was improperly admitted in evidence, the portion of the instruction just quoted was sufficient to cure the error.

The judgments are, and each of them is, affirmed.

Gibson, C. J., and Shenk, J., concurred.

SCHAUER, J.—I concur in the judgments of affirmance upon the ground that in the light of the entire record it appears, either without any dispute or overwhelmingly, that the defendant owed and breached a duty imposed by city ordinance (§§ 91.0102 and 91.3303(d)) to provide exit doors opening "in the direction of exit," and that the failure to provide such doors was a proximate contributing cause of plaintiffs' injuries.

The fact that plaintiffs cannot prove what portion of their injuries is due to the burning they endured while they were held in the flaming room by the illegal door, as distinguished from the portion which may have ensued from the first flash of flame and during the few seconds which elapsed while they were making their way to the door which should have, but did not, swing out, is immaterial. Under the circumstances of this case plaintiffs are not called upon to trace and allocate partial responsibilities (*Summers* v. *Tice* (1948), 33 Cal.2d 80, 87-88 [199 P.2d 1, 5 A.L.R.2d 91]; see Peaslee, *Multiple Causation and Damage* (1934), 47 Harv.L.Rev. 1127) and, in the very nature of the case, the evidence upon which any attempted apportionment of responsibility would have to be based is so uncertain and unsatisfactory to that end as to make it impossible to say that defendant is not liable for all the injuries sustained. The defendant owner should have foreseen that there might be a fire (whether of innocent or wrongful origin) and that his failure to supply legal exits

would cause appreciable, though not apportionable, damage which would not have resulted from the fire alone. Under these circumstances the giving of the other instructions complained of (as to blocking of doors and installing of sprinklers), if erroneous, was not prejudicial.

EDMONDS, J.—The affirmance of the judgment in this case allows the plaintiffs to recover against a property owner upon a verdict rendered by a jury which, the record clearly shows, was misled by incorrect and confusing instructions. The owner was liable for any injuries occasioned by the failure to provide an outswinging door. But the jurors were also told that damages might be awarded because of conditions for which the property owner was not responsible.

It is a fundamental principle that the defendant is entitled to a reversal of the judgment because of prejudicial error when the record shows irreconcilably conflicting instructions and it cannot be ascertained upon what theory the verdict was returned. (*People* v. *Cornett,* 33 Cal.2d 33 [198 P.2d 877] ; *People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828] ; *Wells* v. *Lloyd,* 21 Cal.2d 452 [132 P.2d 471] ; *Westberg* v. *Willde,* 14 Cal.2d 360 [94 P.2d 590] ; *Wright* v. *Sniffin,* 80 Cal.App.2d 358 [181 P.2d 675] ; *Jolley* v. *Clemens,* 28 Cal.App.2d 55 [82 P.2d 51].) As Chief Justice Gibson stated in *People* v. *Dail, supra,* at page 653, ''Inconsistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury.''

In general, and subject to certain exceptions not here applicable, a lessor is not liable for injuries to the person or property of a lessee or his invitees or employees caused by defects in the leased premises (*Neuber* v. *Royal Realty Co.,* 86 Cal.App.2d 596 [195 P.2d 501], and cases cited therein). Accordingly, apart from any duty imposed by ordinance, the lessor in this case owed no duty to the plaintiffs, who were the employees of the lessee.

A municipal ordinance* placed upon the lessor, as the owner of the property where the fire occurred, the duty of maintaining a door opening in the direction of exit. The evidence would

---

*Section 91.3303, Ordinance No. 87,000, city of Los Angeles: ''Doors serving as exits shall open only in the direction of exit. . . .''

Section 91.0642, Ordinance No. 87,000, city of Los Angeles: [Giving requirements for rooms in which explosive materials in specified quantities are manufactured or used in any process] ''(b) Every part of every building shall have two separate exits . . .''; ''(i) Every room housing [explosives] shall be sprinklered.''

support a determination that this duty was breached, and that the breach proximately caused injuries to the plaintiffs. But I cannot agree that the city of Los Angeles placed any legal duty upon the lessor to provide two exits and sprinklers. The requirements in this regard are upon the one using the building rather than the building owner.

Section 91.0502(e) of the ordinance requires sprinklers in every room where certain materials are handled. It is entitled: "Group E-1 Occupancies:", a term which connotes the use of property. The title does not describe a type of building nor does it define a class of building owners; rather, it designates a type of occupant. The section reads: "Every *room* in which explosive materials *in lots of more than eight pounds weight* or flammable liquids are *manufactured or used* in any process . . . [is a Group E. occupancy]." (Italics added.) The section specifies a room having a certain type of use, as being within the terms of the ordinance.

The use is narrowly defined in terms of specified weights of materials. The factors which bring the room within the requirements laid down by the city normally are within the cognizance of the user alone; only he can know whether the "occupancy" is one involving explosives to the extent which brings it within the class defined by the law.

Section 91.0642 of the ordinance provides "Special Requirements for Sub-Group E-1 Occupancies." Here also the title of the section strongly indicates a duty cast upon the occupants of premises and not the owner of them. Part (b) of this section declares that there must be two separate exits. Part (i) requires that "Every *room* housing a Sub-group E-1 Occupancy shall be sprinklered." (Italics added.) However, under section 91.0642, *supra*, the room is not one classified as having a sub-group E-1 Occupancy unless the explosives exceed eight pounds in weight, a condition which is within the direct knowledge and control of the lessee rather than the owner of the property.

The language of these sections is quite different from that used in imposing conditions concerning the general plan of a building. For example, section 91.3303 provides that, "Every door serving as an exit . . . [in areas of specified floor area] . . . shall be *constructed and installed* in conformity with the requirements of this Section . . . [that the door open in the direction of exit]." (Italics added.) The reference to the word "constructed" shows an intent to make the owner of

property responsible for compliance with the standard of safety set by the city. In imposing a duty upon the owner of property, the city has not prescribed any particular use of the premises. As stated in the majority opinion, ''The section applies to all buildings having the requisite amount of floor space regardless of the use made thereof.'' Under these circumstances, Royal Realty Co. is liable for all damages occasioned by its failure to provide a door opening in the direction of exit. On the other hand, it was under no legal duty to provide two exits and sprinklers, and if the jury based its verdict upon the failure to provide them, the judgment should be reversed.

However, even if the lessor owed to the plaintiffs the duty of providing two exits, the record shows the uncontradicted fact that, at the time the lease to the tenant was made, the room where the fire occurred had two doors. The tenant subsequently blocked the rear exit and placed planks over the top of the stairwell leading to it. These were acts of the tenant rather than those of the lessor. But the rear door was not permanently closed. The evidence shows that both it and the stairway were used from time to time when supplies were brought in through the alley. One witness stated that ''We often used that stairway in bringing lumber up. . . .'' This testimony was uncontradicted. The record therefore presents the factual situation of a property owner's compliance with the legal requirement laid down by the city with intermittent restriction by the tenant upon the use of one exit. Under these circumstances, there is no basis for a conclusion that the property owner either failed to provide the two exits, or breached any duty concerning them for which he may be held liable.

· If an ordinance or statute required that, for the purposes of light and · ventilation, there be in every room of given dimensions a specified number of windows, and a room of the stated area were leased, clearly the lessor would not be liable to the tenant's employees for suffocation resulting from a closing of the windows by the tenant. This is particularly true where the windows were not permanently closed and were used from time to time. ''. . . [W]hen a lessee rents premises that are safe as leased, but are rendered unsafe by his use of them, neither the lessee nor his employees can recover from the lessor for injuries resulting from that condition.'' (*Neuber* v. *Royal Realty Co.*, 86 Cal.App.2d 596, 616 [195 P.2d 501], citing *Donahoo* v. *Kress House Moving Corp.*, 25 Cal.2d 237 [153 P.2d 349]; *Scholey* v. *Steele*, 59 Cal.App.2d 402 [138

P.2d 733] ; *Singer* v. *Eastern Columbia, Inc.,* 72 Cal.App.2d 402 [164 P.2d 531] ; and *Runyon* v. *City of Los Angeles,* 40 Cal.App. 383 [180 P. 837].)

It is suggested that because the lease had expired and the tenant was holding over upon a month to month basis, the lessor is not in the position of having leased the premises with two exits. The contention is that a new lease of the premises was created at the time of the expiration of the lease. The first answer to this argument is that, for the reasons which have been stated, the lessor owed no duty to provide two exits. Further, even assuming that such a duty existed, where a tenant holds over in accordance with the terms of a lease, his possession is a continuation of the tenancy under the lease (*Howell.* v. *City of Hamburg Co.,* 165 Cal. 172 [131 P. 130] ; *Robertson* v. *Drew,* 34 Cal.App. 143 [166 P. 838] ; see, also, *Dean* v. *Brower,* 119 Cal.App. 412 [6 P.2d 580] ).

The evidence relating to the burns and disfigurement suffered by the plaintiffs fully justifies the amounts awarded to them by the jury. However, seriousness of injury does not do away with the necessity for a clear basis of liability for damages which have been sustained. And one cannot read the transcript of the proceedings and not come to the certain conclusion that the jurors were confused and misled by the 81 instructions which were given by the trial judge. Indeed, there can be no certainty as to whether the verdicts were based upon the lessor's failure to provide doors opening in the direction of exit, or by reason of any lack of two separate exits, or because of the lack of sprinklers.

All of the sections of the municipal ordinances which have been mentioned were read to the jury by the trial judge. He then told them that if the lessor knowingly let the premises without sprinkler equipment, the ordinance was violated by him. The court also gave the following instruction : ''In reading to you certain ordinances relating to buildings, I have told you what conduct would constitute a violation thereof. I instruct you that the violation, if any, of any of these ordinances by the defendant owner, if such violation proximately caused injury as a result thereof, would constitute negligence unless there is evidence to excuse . . . [his conduct]'' (No. 25).

By another instruction the trial judge told the jurors that he had read to them ''the provisions of certain ordinances and in each instance . . . stated what would constitute a violation thereof insofar as such ordinances may, under the facts

stated, have been applicable to the defendants. . . . Where a statute or an ordinance prescribes a certain conduct, that is to say, requires the doing of a certain act or forbids the doing of a certain act, the violation of such ordinance or statute amounts to negligence as a matter of law. . . .'' (No. 33.) He also charged the jurors ''. . . that neither the violation of the zoning ordinance, if any, as shown by the evidence nor the letting, if any, of a . . . building for housing a Sub-group E-1 Occupancy can afford a basis for recovering by either plaintiff against the defendants. . . .'' (No. 35.) Concisely stated, having declared to the jurors that, under certain circumstances, the letting of a building for Sub-group E-1 Occupancy ''in which explosive materials in lots of more than eight pounds weight or flammable liquids are manufactured or used in any process'' would constitute negligence, they were told that such negligence could not be considered in determining the question as to the liability of the lessor. This and other conflicts in the instructions most certainly were confusing and presented to the jurors no certain basis for determining the lessors' liability.

That the jurors were in doubt about the rules of law governing liability is clearly indicated by the questions of some of them when, during their deliberations, they returned to the courtroom. They asked for a clarification of the ''Law regarding sprinkling system,'' and stated, ''We are confused about a landlord being responsible for results of acts of a tenant.'' They also said, ''Please again give illustration of hypothetical case of landlord and tenant'' although no such case had been mentioned in the instructions. Several more instructions were then read to the jury. The effect of the new instructions was to tell the finders of fact that if they found the lessor was negligent in not providing two exits, or was negligent in not installing sprinklers, and either breach of duty was a proximate cause of the injuries suffered by the plaintiffs, their verdicts should be against the property owner. In *Neuber v. Royal Realty Co.*, 86 Cal.App.2d 596 [195 P.2d 501], an action for damages sustained in the same fire in which the plaintiffs in this case were injured, essentially the same instructions were held to be erroneous.

I agree that the plaintiffs cannot be held to have been guilty of contributory negligence as a matter of law under the applicable ordinances. It is true that section 11.01 of the ordinance defines ''person'' as ''. . . agent, servant, or . . . employee. . . .'' By section 57.27 of the ordinance, any *per-*

*son* is prohibited from permitting the accumulation of an explosive or inflammable material in quantities sufficient to create a fire or explosion hazard. If these provisions were narrowly construed, the plaintiffs' failure to compel their employer to store the explosive refuse safely, or in the event of his refusal to do so, to leave their jobs, would constitute contributory negligence as a matter of law. But implicit in such a statute is the condition that the employee have some real control over the forbidden conduct. Any other construction of the ordinance would defeat an important purpose of the legislation, which is to protect the employee lacking discretion or some authority from the danger imposed upon him by his employer.

However, as the jury may have based its verdict upon one or both of the two asserted grounds of liability which would not justify a recovery by the plaintiffs, rather than upon the duty to provide outswinging exits, the errors in the instructions clearly prejudiced the rights of the lessor and may well have caused a miscarriage of justice (*Wells* v. *Lloyd,* 21 Cal.2d 452, 458 [132 P.2d 471]; *Westberg* v. *Willde,* 14 Cal.2d 360, 369, 371 [94 P.2d 590]). Under these circumstances, the judgment should be reversed.

Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied June 8, 1950. Edmonds, J., Traynor, J., and Spence, J., voted for a rehearing.