[Civ. No. 14882. Second Dist., Div. Three. Dec. 28, 1945.]

ESTHER SINGER, Appellant, v. EASTERN COLUMBIA, INC. (a Corporation), Defendant; Estate of ADOLPH SIEROTY, Deceased, et al., Respondents.

Harold A. Fendler for Appellant.

Schell & Delamer for Respondents.

SHINN, J.—This is an appeal from a judgment of nonsuit in an action for personal injuries. Plaintiff was a salesgirl employed by her brother, Louis Sabin, at a store in Hollywood where linens, baby wares and novelties were sold. She went into the display window space, bent over to remove a baby dress from a standard, rested her right hand upon a plate glass window and was removing the dress with her left hand when the window glass broke, inflicting severe injuries to her arm. The defendants are the owners of a leasehold of the premises; their lessee, Louis Sabin, was occupying them under a month

to month tenancy. The land and building belonged to George and Emily Bennett; it was leased to one Len D. Owens, Jr. for a period of 99 years, one of the covenants of the lease being that the lessee was to keep the building and premises in "constant good condition and repair" for the duration of the lease. Owens transferred the lease to Adolph Sieroty, who accepted the same in writing and agreed to perform all the obligations, conditions and covenants thereof, including the one of repair and maintenance. Adolph Sieroty died, leaving as his surviving heirs at law, devisees and legatees, defendants Bertha M. Sieroty, Julian M. Sieroty, Jean Sieroty, and Perahta Sieroty, said Julian and Bertha being, respectively, executor and executrix of decedent's will. The complaint alleged that said defendants constitute a copartnership which maintained control of and operated the said premises; that between March 1, 1941, and March 1, 1942, one B. J. McElroy was the agent and employee of said partnership, duly authorized to sublease the said premises; that on or about March 1, 1941, defendants sublet the premises to Louis Sabin upon a month to month tenancy "and as a part of the consideration to said sublessee to sublet, rent, use and occupy said premises defendants and each of them orally agreed and covenanted to repair and keep said premises in good condition and repair and specifically covenanted and agreed to repair and keep in good repair and condition the display windows at and about the entrance to said premises, the whole of which premises were intended to be used by said sub-tenant, his employees and the general public as and for a retail store and place of business at the location aforesaid, and under and pursuant to said covenants and agreements aforesaid, said sub-tenant entered into the possession and occupancy of said store and remained in possession thereof as sub-tenant and lessee thereof to, until including and subsequent to the 16th day of January, 1942." Plaintiff's accident occurred January 16, 1942. She did not become of age until September 1, 1943, and she instituted this action March 24, 1944.

It was alleged that defendants negligently maintained the premises in a dangerous, unsafe and defective condition, with full knowledge of such conditions, and that they had repeatedly promised, covenanted and agreed to repair said premises and keep them in good condition. It was specifically alleged that the display windows at and surrounding the entrance

were kept and maintained in a dangerous, unsafe and defective condition, and that as the proximate result thereof the window glass collapsed, thereby causing plaintiff disabling injuries. Defendant Eastern Columbia, Inc. was originally named as a defendant but the action was dismissed by plaintiff as to the corporation. Defendants, by their answer, admitted that by the terms of the original ground lease the lessee covenanted to keep the building and premises in constant good condition and repair, and they admitted that Adolph Sieroty accepted an assignment of the lease and agreed in writing to keep and perform all the terms, conditions and covenants thereof. They denied that they had sublet the premises to Sabin upon a month to month tenancy and denied that they had ever covenanted or agreed to repair or keep said premises in good condition, and in addition to the denials they pleaded the defense of contributory negligence and that plaintiff, with full knowledge of the condition of the premises, assumed the risk of using the same. The case went to trial; upon the conclusion of plaintiff's evidence, defendants moved for a nonsuit upon the grounds which are relied upon for an affirmance of the judgment. The motion was granted and a judgment of dismissal was entered.

It was necessary for plaintiff to plead and prove that defendants owed her the duty of ordinary care to place and maintain the premises in a reasonably safe condition. Accordingly, plaintiff alleged that as a part of the consideration for the subletting, use and occupancy of the premises by Sabin, defendants orally agreed and covenanted to place and keep the premises in good condition and repair. Defendants do not seek to justify the judgment of nonsuit upon the ground that the complaint failed to state a cause of action. They contend (1) that the evidence failed to establish any negligence upon the part of defendants as the proximate cause of plaintiff's injury; (2) that there was no covenant to repair; (3) that if there had been such a covenant there would have been no liability because the tenant knew of the condition prior to the accident, and (4) that plaintiff knew of the dangerous condition, if it was indeed dangerous, assumed the risk, and was guilty of acts of negligence which proximately contributed to her injury.

We will take up first the question of defendants' agreement to repair a specific condition. The following statement will be found in 15 California Jurisprudence, section 114,

page 704: "In the absence of fraud, concealment, or covenant in the lease, a landlord is not liable to a tenant for injuries due to the defective condition or faulty construction of the demised premises. This is the rule at common law, and it has not been changed by section 1941 of the Civil Code." Plaintiff recognizes the rule and relies upon the alleged covenant of the defendants to repair. This agreement was claimed to have been made orally by defendants' agent McElroy. Louis Sabin testified to conversations with McElroy, which are relied upon as proof of the agreement. No objection was made to the testimony nor is it urged on the appeal that McElroy was not shown to have had authority to make the agreement. It appeared from Sabin's testimony that he and one Levi rented the store and after they moved in discussed making a lease for the term October, 1940, to and including February, 1941. One thousand dollars was paid as the first and last months' rent. In March, 1941, Levi having been removed from the picture, Sabin arranged to continue in the premises himself. At that time there was a discussion of the condition of the show windows which furnishes the basis for the present action. The entrance door is deeply recessed, with show windows on each side. The panes extended from the floor to the top of the window space. The first pane of the west window, adjoining the sidewalk, was seven feet long. It extended southerly from the sidewalk a few degrees to the east of south, where it joined a pane three feet long which angled more sharply toward the southwest, where it joined a nine-foot pane extending due south, which in turn joined a six-foot pane extending sharply to the southeast to the entrance door. From the diagram which was used by the witnesses it appears that plaintiff rested her hand upon the first pane about midway between the point where it was attached at the sidewalk and the point where it joined the three-foot pane. It will be noted that at this latter point the panes angled outward from the show window; consequently, any pressure from inside the window would have had a tendency to separate them, whereas pressure from the opposite side would have had a tendency to force them closer together. One of plaintiff's witnesses was a window washer who had washed the windows for 14 months, commencing in January, 1941. He testified that when he commenced cleaning the windows they were wobbly and loose and continued in that condition. He testified that there was

only putty where the panes were joined together; that there was a metal strip at the top and the bottom, but that there was none in the center; that the putty was loose, had fallen out in places, and that when he washed the windows his brush and water went through the "split." This condition of the windows was the subject of discussions between Sabin and Mc-Elroy in January, 1941, and thereafter. According to Sabin, he told McElroy that he intended to take a lease on the store, that during the months of October, November and December rain water had come through the cracks and that termites had been eating his merchandise, and McElroy said: "We'll take care of that. . . . I'm not sure they will fix the window or the painting of the back of the windows, or like that, raising them. He wouldn't trouble with that; but as far as fixing the window he said he had a special man, a maintenance man who took care of those things." Sabin wanted the windows made smaller before he took a lease, a change which would give them a higher base. He testified that he explained about the cracks in the windows and that McElroy promised to take care of them, and that he made special trips down to pay his rent in order to urge McElroy "to fix this place up," that he showed McElroy where the putty was missing and the absence of metal clamps, but that McElroy never agreed to raise the window or paint the back of the showcase and that no lease was signed. He also testified that had it not been for McElroy's promises he would not have remained in possession of the premises. ■ Defendants' construction of this testimony is that McElroy's alleged promises related only to repairs that would be made in the event an agreement was reached as to the terms of a lease. If the evidence was open to that construction, it clearly was not the only one. Had the question been submitted to the jury, a reasonable construction of the evidence would have been that McElroy promised from time to time to repair the condition which existed where the panes joined. This would have been a reasonable conclusion even though the other alterations which were discussed were not to be made unless an agreement should be reached for Sabin to take a lease. Upon this appeal from a judgment of nonsuit we must assume that the jury would have construed the evidence in the light most favorable to the contention of plaintiff. In this view, the evidence would have supported a finding that at the time Levi left the picture and Sabin decided to stay on alone, and at divers later times, defendant's

authorized agent agreed that defendants would make the necessary repairs where the panes joined.

Defendants say that if there was a promise that they would repair the condition of the windows, it was without consideration, but we think the jury could have determined otherwise, and that defendants' original promise to repair was one of the terms of the rental agreement. Also, according to the testimony of Sabin, he relied upon the several later promises to make repairs and was induced thereby to continue his tenancy from month to month. There was therefore evidence that defendants agreed to make the repairs and that the agreement was supported by a consideration.

The next question is whether defendants, having agreed to make the repair in question, owed any duty to plaintiff, Sabin's employee. This depends primarily upon whether the failure to make the repair left the premises in a defective and dangerous condition. The covenant to repair enters into the matter of liability only insofar as it placed defendants under a duty to eliminate the condition of the window if it was a defective and dangerous one. Defendants insist that there was no evidence that the window panes were maintained in an unsafe condition. There was testimony that the windows were ''wobbly and loose'' and that the putty which held the two panes together had fallen out in places. There was also evidence that the panes were held by metal strips only at the top and bottom. Defendants say: ''There is not one iota of evidence of the entire record that the failure of the two plates of glass to be held together in any way rendered either more likely to break. For all that appears in the record, the fact that the plates of glass were not held rigidly on all four sides may have reduced the danger of breakage owing to the greater amount of give which they thereby possessed. . . . Where a plate of glass is free at one end, it is possible for it to bend with pressure rather than to break. Where, however, the plate is firmly held on all four sides, this possibility of bending greatly is reduced and necessarily the possibility of breaking is equally increased.'' This argument is not supported by any evidence and we think it expresses a conclusion of fact with which the jury might reasonably have disagreed. We think the jury might have concluded that the pane would not have broken if it had been more securely fastened. They may have understood from plaintiff's testimony that she placed her right hand upon

the window in order to retain her balance as she lifted a dress from a standard with her left hand. It seems to us that the jury might have concluded, with reason, that the pane, being loose and wobbly as described, did not serve to aid plaintiff to maintain her balance as she expected, and that its recession caused her to place additional pressure upon it. Although she testified that her feet were placed firmly upon the floor, it is obvious that she expected to some extent to receive support from the window pane. ■ Defendants also say: ''There is not one iota of evidence in this case that the disrepair (the failure of the two plates to be physically joined together) created any risk to any person or that the joining of these plates together by means of putty or any other substance would have prevented any such risk.'' It may very well be that the joinder of the two panes with putty would not have enabled them to withstand any great pressure. But plaintiff's testimony was that she placed her hand lightly upon the pane, putting ''hardly any'' pressure upon it, and we cannot say as a matter of law that if the panes had been joined together firmly, one of them would have given way under light pressure. It appears from the evidence that the panes had not been held together at the edges by anything stronger than putty. If a renewal of the missing putty would not have given the joint sufficient strength to withstand slight pressure, it could have been determined by the jury, with reason, that a more efficient binder or joinder should have been used to render the premises reasonably safe. Giving full effect to plaintiff's testimony, as we must upon an appeal from a judgment of nonsuit, we are of the opinion that a determination by the jury that the condition was not a reasonably safe one and that its unsafety resulted from defendants' negligence would not have been unsupported by the evidence.

■ A further contention is that even if there was a covenant to repair, there was no liability because the tenant had knowledge of the conditions. Defendants rely upon a statement in *Runyon* v. *City of Los Angeles* (1919), 40 Cal. App. 383, 392 [180 P. 837], quoted in part in *Shotwell* v. *Bloom* (1943), 60 Cal.App.2d 303, 311 [140 P.2d 728], and in *Scholey* v. *Steele* (1943), 59 Cal.App.2d 402, 405 [138 P.2d 733], that ''one who, upon the express or implied invitation of the tenant, enters or is proceeding to enter upon the leased premises, is an invitee, and as such stands in the

shoes of the tenant" and may recover against the landlord only if the tenant could recover. The statement that the invitee may not recover if the tenant cannot recover is sought to be applied to a case in which the landlord has agreed to make repairs. But the quotations from the Runyon case are incomplete, the remainder of the sentence being, "and that the tenant may not recover if the burden of repairing rests upon him." In both the Runyon and Shotwell cases the duty to make repairs was upon the tenant. It is well settled that the landlord is under no liability in such a case for injuries to the tenant or his invitees unless he conceals or fails to disclose the defective conditions and they are not known to the tenant. (*Shotwell* v. *Bloom, supra;* 15 Cal.Jur. p. 704, § 114; 7 Cal.Jur. 10-Yr. Supp. p. 440; Restatement, Torts, § 358.)

*Scholey* v. *Steele, supra,* was a case in which the court affirmed a judgment in favor of an invitee of the tenant for injuries sustained by reason of defective premises which the landlord had agreed to repair. The tenant had knowledge of the defective condition and requested the landlord to correct it and the landlord had promised to do so. Plaintiff, the tenant's invitee, had no knowledge of the condition. The court followed the Restatement, Torts, volume 2, section 357, reading as follows: "A lessor of land is subject to liability for bodily harm caused to his lessee and others upon the land with the consent of the lessee or his sub-lessee by a condition of disrepair existing before or arising after the lessee has taken possession, if (a) the lessor, as such, has agreed by a covenant in the lease or otherwise, to keep the land in repair, and (b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented. *Comment: a. Nature of lessor's duty.* The lessor's duty to repair in so far as its breach subjects him to liability for bodily harm caused to the lessee and those upon the land in his right, is not contractual but is a tort duty based on the fact that the contract gives the lessor ability to make the repairs and control over them." The rule, insofar as liability to an invitee is concerned, is not predicated upon the tenant's lack of knowledge of the defective condition, and this the court in the Scholey case no doubt had in mind when following the rule, since the tenant in that case had full knowledge of the condition. The fact that the tenant has knowledge of a defective condition, although

it relieves the landlord of liability where there is no agreement upon his part to repair, does not relieve him where there is such an agreement. This is entirely reasonable, for when the duty rests upon the landlord the tenant will naturally depend upon him to make the repairs and allow conditions to exist which he would otherwise cause to be corrected. Under defendants' theory a landlord having contracted to keep premises in repair would be under no greater liability for injuries to his tenant, or the latter's invitees, than if there had been no such covenant. But the agreement of the landlord to correct a condition which is dangerous places him under a duty which would not exist otherwise, and in order to relieve himself of responsibility he must correct the condition as agreed, and not merely notify the tenant that it exists.

 It is apparently argued by defendants, in reliance upon the general statement that the tenant's invitee may not recover unless the tenant can recover, that any negligence upon the part of the landlord should be imputed to his invitees. The same argument was made in the Scholey case and the court, citing authority, expressed doubt whether the rule of imputed negligence was applicable, and also said (p. 406): "Furthermore, even if the doctrine of imputed negligence is applicable, it would still present a question of fact for the trial court as to whether a person of ordinary prudence with the tenant's knowledge would continue to use the steps."

We are aware of neither authority nor sound reason for applying the doctrine of imputed negligence to a case of injury to the tenant's invitee which has resulted from the landlord's breach of duty to make repairs. The rule applicable in such case is that if the landlord has agreed to repair a specific condition which is known to be dangerous, he is liable for injuries to the tenant's invitees resulting from that condition, just as the tenant alone would be liable if the duty to repair rested upon him and he had knowledge of the condition. In either case the invitee of the tenant is chargeable with knowledge only of what he actually knows or, in the exercise of ordinary care, should know of the dangerous condition.

 Defendant's final argument is that plaintiff must certainly have known of the condition of the window panes and that she assumed the risk involved and was guilty of contributory negligence. She testified that she had never been in the window before and had no knowledge whatever

that the panes were not securely fastened. Louis Sabin testified that he had never told her of the condition of the panes. That was a condition which would not necessarily have been discovered in the exercise of ordinary care by one in plaintiff's situation. As before noted, plaintiff testified that she exerted scarcely any pressure against the window pane. Upon the motion for nonsuit it was the duty of the trial judge to give full effect to plaintiff's testimony. Therefore, the questions whether plaintiff was guilty of negligence in failing to discover the condition of the window panes and to appreciate the danger of that condition and whether she exercised ordinary care in pressing her hand against the pane were for the determination of the jury. These were questions upon which reasonable minds might differ, and the judgment of nonsuit cannot be sustained upon the ground that the evidence admitted only of the conclusion that plaintiff was guilty of contributory negligence.

The judgment is reversed.

Desmond, P. J., and Wood, J., concurred.

A petition for a rehearing was denied January 23, 1946, and respondents' petition for a hearing by the Supreme Court was denied February 21, 1946.