[Civ. No. 19236. First Dist., Div. One. June 12, 1961.]

ANNIE L. McNALLY, Appellant, v. WILLIAM P. WARD et al., Respondents.

Carl H. Heil and Lew M. Warden, Jr., for Appellant.

Berry, Davis & Channell and William R. Channell for Respondents.

TOBRINER, J.—This appeal, taken on a judgment roll, involves an action for personal injuries suffered by appellant when she fell from the rear porch of an apartment which she leased from respondent landlords. In contending that the trial court erred in ruling that respondents did not owe her a duty to maintain the porch and railing in a state of good repair, appellant would predicate such a duty upon any one of three bases: (1) an Alameda city ordinance; (2) the reservation by respondents of control over the landing guarded by the defective railing; or (3) an oral covenant by respondents to "maintain" the premises. We shall explain why we have found that the ordinance established such a duty; that the trial court erroneously concluded as a matter of law that respondents did not reserve control over the involved area, and that the trial court correctly concluded that the oral covenant did not impose liability in this case.

The facts appear in the trial court's findings of fact and conclusions of law. Appellant fell from a wooden porch at the rear of her apartment. The proximate cause of her fall "was a defective wooden railing on the landing, which broke when . . . [appellant] fell against it." While respondents did not know of the defective condition, they "could have obtained such knowledge had they made reasonably careful inspections, which . . . [they] did not make."

At the time appellant entered into the oral lease, one of respondents told her that he maintained the premises. During appellant's occupancy this respondent made repairs in her apartment and about the premises but not on the stairway in question. The court found that "these facts . . . [were] not sufficient as a matter of law to support a finding that the . . . [respondents] entered into an express covenant with . . . [appellant] to repair her premises."

The court further found that respondents "furnished and paid for garbage removal services to . . . [appellant] and for that purpose furnished a garbage can which was placed on a landing on the stairway in question immediately adjacent to the landing guarded by the defective rail and two steps down" and that the "can was used solely for the disposal of . . . [appellant's] garbage." The court then found that those facts were "not sufficient as a matter of law to amount to the retention by . . . [respondents] of any control over the stairway."

At the time of the accident the city of Alameda's ordinance number 1002 adopted as the city's building code major portions of the "Uniform Building Code, 1949 Edition, Volume I," accepted at the Pacific Coast Building Officials Conference.[1] The court stated in its "Conclusions of Law" that the ordinance created duties on respondents "as far as the City of Alameda is concerned, but that no duty was owed thereby to . . . [appellant]." Thus, the court concluded that "while . . . [respondents] would be liable to . . . [appellant] for the injuries sustained by her if they were under a duty to maintain the leased premises in a state of repair, . . . [they] owed no such duty to . . . [appellant]. . . ."

We shall separately analyze each of the three propositions

---

[1]The following sections were among those portions thus adopted:

"Sec. 102. The purpose of this Code is to provide minimum standards to safeguard life or limb, health, property, and public welfare by regulating and controlling the design, construction, quality of materials, use and occupancy, location and maintenance of all buildings and structures within the city and certain equipment specifically regulated herein.

"The provisions of this Code shall supplement any and all laws of the State relating to buildings."

"Sec. 104(i) Maintenance. All buildings or structures both existing and new, and all parts thereof, shall be maintained in a safe and sanitary condition. All devices or safeguards which are required by this Code in a building or structure when erected, altered, or repaired, shall be maintained in good working order. The owner or his designated agent shall be responsible for the maintenance of buildings and structures."

"Sec. 3301(a) Purpose. The purpose of this Chapter is to provide minimum standards of egress facilities for occupants of buildings.

"(b) Scope. Every building shall be provided with exits as required by this Chapter. Where there is conflict between a general requirement and a specific requirement for an individual occupancy, the specific requirements shall be applicable."

"Sec. 3305(g) Handrails. Stairways shall have handrails on each side, and every stairway more than eighty-eight inches (88") in width shall have intermediate handrails dividing the stairway into portions not more than sixty-six inches (66") in width.

"Handrails shall be placed not less than thirty inches (30") nor more than thirty-four inches (34") above the nosing of treads, and ends of handrails shall be returned to the wall."

upon which appellant predicates respondents' duty to inspect the premises for defects and to repair them if such defects be discovered.

1. *The city ordinance imposed upon the landlords a duty to repair the railing, and such duty involved the obligation to inspect such railing.*

We do not believe that the requirement of the Alameda city ordinance that the owner of the building maintain it in a safe condition should be limited to the narrow obligation expressed by the trial court: that it "creates duties . . . as far as the City of Alameda is concerned, but that no duty was owed thereby to the . . . [appellant]." We shall first point out why the violation of the duty to repair under the ordinance inures to the protection of the tenant, affording to her a cause of action for injuries resulting from the defect. We shall then set forth our reasons for concluding that the landlord's duty to the tenant should not be restricted only to repair of defects of which he knew or as to which he received notice.

Turning to the first issue, we believe that the great majority of courts today would hold that statutory requirements for maintenance of property by the landlord embrace a liability on his part for injury to occupants resulting from his failure to repair in a situation in which the landlord had notice of the defect. In *Whetzel* v. *Jess Fisher Management Co.* (D.C. Cir., 1960), 282 F.2d 943, Judge Bazelon characterized as a "landmark case" (p. 945) the decision in *Altz* v. *Leiberson* (1922), 233 N. Y. 16 [134 N. E. 703], which allowed a tenant to recover for injuries sustained from a falling ceiling, "which the defendant, after timely notice of the danger, had omitted to repair." (P. 703 [134 N. E.].) There, "Judge Cardozo, writing for the New York Court of Appeals, held that the New York Tenement House Law, which provided that 'every tenement house and all the parts thereof shall be kept in good repair,' thus 'changed the ancient rule' and imposed upon landlords a duty that 'extends to all whom there was a purpose to protect.' That statute did not specify who had the duty of repair; nor did it speak of tort liability. It only authorized penalties in criminal enforcement proceedings. [Footnote omitted.] Nevertheless, the court held that: 'The Legislature must have known that unless repairs in the rooms of the poor were made by the landlord, they would not be made by anyone. The duty imposed became commensurate with the need. The right to seek redress is not limited to the city or its officers.' " (P. 945.)

In similar vein, in interpreting statutory requirements as to maintenance of buildings, the California cases hold that such persons as constitute members of the class for whom the legislation was enacted may sue the landlord for negligence in failing to fulfill such a requirement. In *Finnegan* v. *Royal Realty Co.* (1950), 35 Cal.2d 409 [218 P.2d 17], a Los Angeles building code set forth its purpose to be "to safeguard life or limb, health, property and public welfare by regulating and controlling . . . maintenance of all buildings . . . within the city." (P. 412.) The ordinance provided that *"Doors serving as exits shall open only in the direction of exit"* (p. 413); the failure of the owner to comply with that requirement prevented the escape of plaintiffs, employees of the tenant, from a fire in the building. The court held that the provision of the building code "established" "[a]ppellant's duty to these respondents [tenant's employees] to provide a proper exit from the premises. . . ." (P. 416.) The court states generally that "The violation of such a legislative enactment may be negligence in itself if the plaintiff is one of a class of persons whom the statute was intended to protect and the harm which has occurred is of the type which it was intended to prevent." (P. 416.) (To the same effect: *Roxas* v. *Gogna* (1940), 41 Cal.App.2d 234 [106 P.2d 227].)

A series of California cases have held that those persons who suffer injury because of failure to conform to safety regulations in cases of defects known to the landlord, or for which he is otherwise liable, fall within the class of persons intended to be protected by them. Thus the court in *Longway* v. *McCall* (1960), 181 Cal.App.2d 723 [5 Cal.Rptr. 818], ruled that safety orders promulgated by the Division of Industrial Safety of the State of California concerning elevators "were issued to safeguard the general public against injury or loss of life" and that the plaintiff, a subtenant, "was entitled to the benefit of their protection." (P. 727.) In *Porter* v. *Montgomery Ward & Co., Inc.* (1957), 48 Cal.2d 846 [313 P.2d 854], the court held that a safety order, regarding stairways, issued by the Division of Industrial Safety, protected the public generally, including business invitees as well as employees. *Ewing* v. *Balan* (1959), 168 Cal.App.2d 619 [336 P.2d 561], involved section 16905 of the Health and Safety Code which required gas appliances to be " 'maintained in good repair' " (p. 621); the State Housing Act, of which section 16905 was a part, provided that its provisions " 'constitute minimum requirements for the protection, health, and

safety of the public and of the occupants of apartment houses, hotels, and dwellings.'" (Pp. 621-622.) The court held a tenant to be "a member of the class for whose benefit section 16905 was enacted. . . ." (P. 622.) *Black* v. *Partridge* (1953), 115 Cal.App.2d 639 [252 P.2d 760], also involved section 16905; the court rendered a similar statement regarding the rights of a tenant.

In the instant case, the ordinance obviously intended the protection of occupants of the buildings covered by the ordinance. The building code adopted by the city included that section of the uniform code which states its purpose to be "to provide minimum standards to safeguard life or limb, health, property, and public welfare by regulating . . . maintenance of all buildings. . . ." The city code further declared that "[a]ll buildings or structures both existing and new, and all parts thereof, shall be maintained in a safe and sanitary condition" and "[t]he owner . . . shall be responsible for the maintenance. . . ." Those persons most interested in the safety of a building are its occupants; it is the "life or limb" and "health" of the occupant that the ordinance is designed to protect. We cannot conceive that the duty to repair the defect of which the owner has knowledge should be fragmentized under such an enactment into differing pieces of obligations to the government, the public, the tenant, the business invitee. The purpose of the ordinance is the establishment of a general duty, not a coterie of specialized ones, and we should effectuate the legislative objective.

Respondents argue that section 1941 of the Civil Code negates any contention that the landlords owed a duty under the ordinance to the tenant to repair the premises. That section, as amended in 1873, provides: "The lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof. . . ." The following section, 1942, severely limited the tenant's remedies, providing, in the words of *Gately* v. *Campbell* (1899), 124 Cal. 520 [57 P. 567], that "the only consequence of a breach of the landlord's obligation is that the tenant may either vacate the premises or expend one month's rent for repairs." (P. 523.) (*Carty* v. *Blauth* (1915), 169 Cal. 713, 716 [147 P. 949]; *Scholey* v. *Steele* (1943), 59 Cal.App.2d 402, 405 [138 P.2d 733].) But appellant does not rely on section 1941; rather she contends that the very enactment of the Alameda ordinance shows the city in-

tended that the duty to repair be extended to the class of people of which she was a member. If the only effect of the ordinance as to tenants were to establish their right to repair and subtract the cost, the ordinance would be pointless in view of Civil Code sections 1941 and 1942.

 If we conclude, then, that the landlord owes a duty to the tenant for repair of defects of which he knows, we must next approach the question whether that duty covers the obligation to inspect the premises to determine the need for such repairs. While the earlier legal concepts regarded the lease as equivalent to a sale of the premises for the term and therefore held that the landlord was under no obligation to keep the premises in repair, modern statutes and ordinances have carved exceptions into this doctrine. Suggesting that these legislative enactments emanate from the likelihood that the tenant is impecunious and "unable to make the necessary repairs," Prosser points out that "This policy is expressed by statutes in a number of states, which require the landlord to put and keep certain types of premises, such as tenement houses, in good condition and repair, and have been held to impose liability in tort upon him for his failure to do so. [Footnote omitted.]" (Prosser, Law of Torts (2d ed. 1955) § 80, p. 466.) An added basis for such enactments could very well be that the tenant has only a transitory interest in the property whereas the landlord exercises a far more lasting concern in the condition of the premises.

As we have suggested, we must determine whether the ordinance here requires inspection of the exterior premises, where a railing had fallen into disrepair, and we do so in the light of these observations. This ordinance changes the common-law rule to the extent that it requires that the landlord provide this prescribed safeguard. Our case involves the maintenance of an outside railing and porch. The half performance of the landlord's duty could be more dangerous than its nonperformance. The installation or retention of defective guard rails could prove more disastrous than the absence of guard rails. We are reminded of Justice Traynor's language as to the comparable situation in *Burdette* v. *Rollefson Construction Co.* (1959), 52 Cal.2d 720, 725 [344 P.2d 307]: "A guard rail begets reliance, and its termination suggests safety. A railing that is not coterminous with the peril against which it guards may be more dangerous than none at all."

While we probe here a specific impact of the landlord's obligation, the repair of an exterior porch and railing, we

note both commentators and cases urge an even wider duty than our case impels.

Pointing out that the "duty of the landlord to inspect would be a reasonable one," Feuerstein and Shestack, *Landlord and Tenant—The Statutory Duty to Repair*, analogize the statutory duty thus imposed on the landlord to the duty of inspecting common areas, saying: "There the landlord has been held liable if he knew of the defect or would have known of it had he undertaken reasonable inspection. [Footnote omitted.] A similar duty could be placed upon the landlord regarding defects in the rented premises. It should be noted that the additional responsibility would not seem too burdensome; the inspection could be carried out by the same personnel and at the same time that the landlord was fulfilling his common law duty of maintaining in good repair the common portions of the premises." (1950, 45 Ill.L.Rev. 205, 214-215.)

We observe, likewise, that Circuit Judge Bazelon in *Whetzel* v. *Jess Fisher Management Co., supra,* 282 F.2d 943, has reached the conclusion that the landlord bears the duty of inspection under a comparable enactment. There, the court considered the District of Columbia housing regulations providing for building standards for multiple dwellings. The commissioners of the District stated that they " 'promulgate these regulations for the purpose of preserving and promoting the public health, safety, welfare, and morals.' " (P.949.) The violation of the regulations was punishable by fine or imprisonment. Plaintiff suffered injury because of a defect in the ceiling of the premises. Reversing the District Court's decision which granted a summary judgment because the owner had no notice of the defect, the Court of Appeals stated: "We think actual knowledge is not required for liability; it is enough if, in the exercise of reasonable care, appellee should have known that the condition of the ceiling violated the standards of the Housing Code." (P. 951.) *Garner* v. *Ritzenberg* (Mun. Ct. D.C., 1961), 167 A.2d 353, 355, follows *Whetzel* in holding the landlord liable to the tenant for property damage resulting from violation of the housing regulations of the District of Columbia.

A similar view finds expression in the Louisiana case of *Roppolo* v. *Pick* (La. App., 1941), 4 So.2d 839, in which the court declared: "[I]gnorance of the unsafe condition of a structure on the part of the owner, or that he did not, or could not, discover the defective condition, does not relieve him of

the duty imposed by the Civil Code to maintain his property in a condition of safety to others." (P. 843.) (Accord: *Champagne* v. *Hearty* (La.App., 1954), 76 So.2d 453, 454.)

We limit our conclusion, of course, to the facts before us: the defective condition of an exterior railing, a condition as to which the landlords could have obtained knowledge, had they made "reasonably careful inspections." The general observations of the foregoing cases and writers proceed beyond our factual situation,[2] and we do not rule here upon such other situations. We hold only that the protection of the ordinance at least extends to the requirement of inspection of the exterior railing. To narrow the scope of the ordinance to the lower landing, and to exclude the two steps and landing above, is to cut the effectiveness of the ordinance into bits. The vice of finely drawn mathematical subdivision applies equally, both to the application of the ordinance and, as we shall point out *infra,* to the definition of the landlord's common-law duty with respect to a "common area."

To require inspection of exterior railings and porches does not call for an invasion of the private quarters of the tenant; the observation of such outside appurtenances falls quite naturally within the reasonable scope of a landlord's scrutiny. We can hardly believe that the city intended that the landlord could fulfill his duty under the ordinance as to the instant defective railing by staying away from his own property and

---

[2] While the annotators point out that "it is generally held that the liability arises only where the landlord had actual or constructive notice of the defect in question, and thereafter failed to make the necessary repairs within a reasonable time" (17 A.L.R.2d 704, 722), many of the cited cases involve situations of interior rather than external defects. See for instance, *Pease* v. *Nichols* (Ky., 1958), 316 S.W.2d 849, 851: "Whether the landlord's duty to furnish lighting is created by statute, ordinance or common law, failure to perform that duty constitutes actionable negligence only when there is notice to the landlord, actual or constructive of the conditions constituting the failure"; *Fogarty* v. *M. J. Beuchler & Son* (1938), 124 Conn. 325 [199 A. 550], holding that the Legislature could not have intended liability for injuries due to defects in plumbing unless landlord "knew of them or ought to have discovered them by reasonable inspection." (P. 552 [199 A.].)

Although respondents contend that California "appellate decisions have implicitly held or stated" that the provisions of the State Housing Act (Health & Saf. Code, §§ 15000—17902) do not impose a duty of inspection on the landlord, the cited decisions do not so rule. Of the cases cited, *only Wilson* v. *Ray* (1950), 100 Cal.App.2d 299 [223 P.2d 313], even mentions the state statute. In that case plaintiff claimed noncompliance with section 16903, which provided three alternative methods for ventilation of gas ranges. The plaintiff failed to prove noncompliance with all three alternatives and therefore did not show negligence. The other cited cases do not so much as allude to the provisions of the State Housing Act.

insulating himself in his own ignorance.

2. *The court erred in finding that the facts were insufficient as a matter of law to show that respondents retained control over the stairway.*

██ Appellant attacks the trial court's finding that the facts concerning the furnishing of garbage removal services by respondents and the location of the can near the landing guarded by the defective railing were "not sufficient as a matter of law to amount to the retention by the . . . [respondents] of any control over the stairway." Appellant "concedes the trial court's *discretion,* on the instant facts, to find that there was no joint control *as a matter of fact.*" We shall point out that while the trial court could have found as a matter of fact that respondents did not retain control over the involved portion of the stairway the court erred in so holding as a conclusion of law.

The issue narrows to the dual inquiry as to whether or not respondents retained control over the defective area and whether or not, in the circumstances of this case, the court could determine that question as a matter of law. If respondents did retain such control, their liability is clear since the court found that they "could have obtained . . . knowledge [of the defect] had they made reasonably careful inspections, which . . . [respondents] did not make."

In most of the situations that have confronted the courts, they have regarded the question of control as one of fact. "[W]hether the lessor reserved the defective portion of the premises for such common use or whether the same were under the exclusive dominion of the tenant" is ordinarily a question of fact. (*Hassell* v. *Denning* (1927), 84 Cal.App. 479, 482-483 [258 P. 426]; Goddard, California Landlord-Tenant Law and Procedure (3d ed., 1952), p. 111). Thus, in *Goodmaker* v. *Kelley* (1957), 154 Cal.App.2d 457 [316 P.2d 746], the trial court found, as an issue of fact, that the landlord had not reserved exclusive control of the stairway which led only to plaintiff's apartment. And in *Burks* v. *Blackman* (1959), 52 Cal.2d 715 [344 P.2d 301], in which the plaintiff used a porch and stairway at the rear of the apartment immediately outside and opposite her back door, the court stated that "[t]he ultimate factual question that should have been submitted to the jury was whether defendants retained sufficient control over the area where the injury occurred to place upon them the duty of using reasonable care to keep the property in repair." (Pp. 718-719.)

The facts of the case before us are not so powerful that they compel a conclusion that the landlords did not retain sufficient control over the area to impose upon them the duty of due care. They designated the general area as the place for the deposit and removal of garbage. Their business invitees used the steps to the first landing and the landing itself for the disposition of the garbage. Respondents would have us segregate those steps which the tenant used to deposit the garbage from those which the business invitees used to remove it.
Such a line is finely drawn. We do not doubt that it could be so fixed as a finding of fact but we cannot ascertain here the compulsions which would sustain it as a matter of law.

To draw the line so minutely is to overlook the involved basic considerations. The landlords provided the can for garbage disposal, and, in essence, directed the tenant to use the two upper steps to get down to it. ''The furnishing of the means and the place for disposal of garbage for all practical purposes was a necessary service for the reasonable utilization of the premises for the purposes for which they were rented. In so using such method of disposal furnished by appellant the respondent [the tenant] neither exceeded the scope of his invitation nor lost his status as an invitee.'' (*Keane* v. *McIndoe* (1949), 93 Cal.App.2d 82, 85 [207 P.2d 1059].)

While in the *Keane* case the garbage can was used by plaintiff ''in common with the other tenants'' (p. 85), and the court held that the landlord bore the obligation of exercising ordinary care in providing access to it, the case is nevertheless enlightening on the nature of the landlord's obligation. In the instant case the obligation cannot be properly performed by the neat exclusion of the last two of these steps. The obligation extends for the whole access; the landlords who unquestionably must discharge the duty for the flight of steps, and who in so doing must at least observe the last two, cannot, as a matter of law, put on blinders as to them. The duty of due care, in these circumstances, is not susceptible to such mathematical subdivision.

*Yazzolino* v. *Jones* (1957), 153 Cal.App.2d 626 [315 P.2d 107], displays a similar aversion to such fine splitting of areas of control, holding the common stairway could not be segregated even though the ''upstairs'' tenant exclusively used the upper portion. In that case there was not the added element of the landlord's designation of access to a public utility, which adds some weight to the landlords' responsi-

bility here. This district, Division Two, stated: "If the upstairs tenant had wanted to use the stairway to get to the back door of her flat, she would have had to use the lower portion of the stairway. There is no question therefore that the lower portion of the stairway was a common areaway. It would be ridiculous to say that, although the lower portion of the stairway was a common areaway, the upper portion was not because it led only to the flat of the upstairs tenant. . . ." (P. 633.)

Respondents rely on language in *Schafer* v. *Mascola* (1958), 163 Cal.App.2d 53 [328 P.2d 865], to uphold the court's legal finding of lack of retention of control. There the stairway in question was "an independent exterior stairway leading to the upstairs flat." (P. 56.) The court declared: "There was no evidence to indicate that the defendants reserved control of the stairway for the use of other tenants in common with the plaintiff. In the absence of such conflicting evidence, the issue of control was not an issue of fact for the jury." (P. 56.) We do not believe the *Schafer* case is necessarily controlling; we believe retention of control by the landlords for their business invitees or themselves could be sufficient to establish liability here.

Because of the reasoning set forth above we believe that the facts were not sufficient as a matter of law to negate the respondents' retention of control of the stairway.

3. *In the circumstances of this case the court committed no error in concluding as a matter of law that respondents were not liable for a breach of a covenant to maintain the premises by a failure to inspect the premises in the absence of notice of need for repairs.*

The court found that one of the landlords [respondents] told appellant at the time they entered into the oral lease that he "maintained the premises." During her occupancy he "made repairs in the apartment and about the premises, but not the particular stairway in question." The court concluded that those facts were not sufficient "as a matter of law" to show an express covenant to repair. Appellant claims that the facts found by the court "not only were sufficient to bring the conclusion [an express covenant] well within the area of the trial court's sound discretion, but virtually compelled the conclusion that a covenant in fact existed."

Whatever the uncertain state of the authorities in California upon the first two topics discussed in this opinion, the

precedents are clear as to this third point. ▆▆ The early decision of the Supreme Court in *Sieber* v. *Blanc* (1888), 76 Cal. 173 [18 P. 260], specifically holds that a covenant to maintain the premises obligates the landlord to repair only in a reasonable time after notice from the tenant. The court says: "[S]uch covenant was construed to mean in a reasonable time after notice from the tenant. (Taylor on Landlord and Tenant, 8th ed. § 330; Wood on Landlord and Tenant, ed. of 1881, p. 610; *Spellman* v. *Bannigan*, 36 Hun, 174.)" (P. 174.)

Prosser similarly states: "The jurisdictions which find a tort duty usually construe the lessor's covenant, in the absence of an express provision to the contrary, to mean merely that he must repair only within a reasonable time after he has been notified of the dangerous condition, or has otherwise discovered it. [Footnote omitted.]" (Prosser, Law of Torts (2d ed. 1955) § 80, p. 475.) (Citing *Sieber* v. *Blanc, supra,* 76 Cal. 173; *Des Marchais* v. *Daly* (1949) [135 Conn. 623 (67 A.2d 549)] [*Cooper* v. *Roose*] (1949), 151 Ohio St. 316 [85 N.E.2d 545]; Restatement of Torts, § 357, comment a.)

On the other hand, the cases cited by appellant (*Scholey* v. *Steele, supra,* 59 Cal.App.2d 402; *Singer* v. *Eastern Columbia, Inc.* (1945), 72 Cal.App.2d 402 [164 P.2d 531]; *Jones* v. *Regan* (1959), 169 Cal.App.2d 635 [337 P.2d 889]), do not establish that the landlord's agreement imposes liability in the absence of notice; in each of them he had actual knowledge of the defect and the only issue before the court involved the existence of a covenant to repair.

▆▆ In the instant case, the contract, if it existed at all, provided only that respondents would maintain the premises. It did not so much as mention inspection by the landlords. Under the authorities set out above, respondents would not be liable for repairs in the absence of the notice of defects and the need for repairs.

In determining the issues of this case we have concluded that the crowded conditions of urban living, which probably inspired the kind of protective ordinance we consider here, render impractical bisected interpretation of the ordinance; it does not establish a duty to the municipality only but to the tenant as well. If its purpose is to be at all served it must require inspection of exterior porches and railings by the landlord, who is the most likely person to be interested in the permanent safety of the property. Similar considerations forbid a too minute mathematical subdivision of areaways

in defining common areas. The landlords' covenant to maintain the premises does not, however, pursuant to the cases, render them liable for repairs in the absence of notice. We think that these are the lines of landlord responsibility which the current considerations and cases draw as to the particular porch and railing here involved.

We reverse the judgment and remand the cause for trial in accordance with this opinion.

Bray, P. J., and Duniway, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 9, 1961.